## UNITED STATES v. DELAWARE & H. CO.

(Circuit Court, E. D. Pennsylvania.  September 10, 1908.)

Nos. 85, 87, 89, 91, 95, and 97, in Equity.

Nos. 202, 204, 206, 208, 212, and 214, at Law.

1. CONSTITUTIONAL LAW — INTERSTATE COMMERCE — POWER OF CONGRESS TO REGULATE.

The power of Congress under the commerce clause of the Constitution to regulate interstate and foreign commerce is limited by the other provisions of the Constitution, and among them that of the fifth amendment, that no person shall be deprived of life, liberty, or property without due process of law; and the validity of a statute enacted in the assumed exercise of such power may be challenged on the ground that it is in violation of such provision.

2. SAME—CONSTITUTIONALITY OF STATUTE—COMMODITY CLAUSE OF INTERSTATE COMMERCE ACT—"REGULATION OF INTERSTATE COMMERCE."

The "commodities clause" of the interstate commerce act (Act Feb. 4, 1887. c. 104, 24 Stat. 379 [U. S. Comp. St. 1901, p. 3154]), as amended by Act June 29, 1906, c. 3591, 34 Stat. 584 (U. S. Comp. St. Supp. 1907, p. 894), which makes it unlawful for any railroad company to transport in interstate or foreign commerce any article or commodity, "other than timber and the manufactured products thereof, manufactured, mined or produced by it or under its authority, or which it may own in whole or in part, or in which it may have any interest, direct or indirect, except such articles or commodities as may be necessary and intended for its use in the conduct of its business as a common carrier," is not a regulation of interstate commerce, within the commerce clause of the Constitution, but entirely excludes from such commerce a certain class of persons, and is unconstitutional and void as applied to railroad companies which, under the sanction and encouragement of state laws, had more than 50 years before its enactment become the owners of coal lands in such state, and by themselves, or subsidiary companies of which they owned the stock, developed mines thereon, and constructed railroad lines thereto at great expense, and engaged extensively in the mining of coal, a large part of which was necessarily marketed in other states, and which could not practically be transported, except over their own lines, nor marketed within the state, as depriving such companies of their liberty and property without due process of law, in violation of the fifth constitutional amendment.

3. COMMERCE—POWER OF COURTS TO DETERMINE VALIDITY OF STATUTE.

The power to regulate interstate commerce is a distinct and substantive power granted to Congress by the Constitution, subject to the limitations thereof, and is not the equivalent of the reserved police powers of the states, which must always remain indefinite in character and incapable of classification or definition; but an enactment in the assumed exercise of such power, like one by a state under its police powers, is reviewable by the courts to determine whether it is within the power granted as so limited by the Constitution itself, and a legitimate and reasonable exercise thereof.

4. SAME—LIMITATION OF POWER OF CONGRESS.

The power of Congress under the commerce clause of the Constitution to regulate interstate commerce does not include the power to entirely exclude from such commerce an article or commodity which is a legitimate and useful subject of commerce, and not inimical to public safety, health, or morals, save when, and because, it is the property of a certain class of owners.

Buffington, Circuit Judge, dissenting.

Bills in equity and petitions for mandamus on behalf of the United States against the Delaware & Hudson Company, the Erie Railroad Company, the Central Railroad of New Jersey, the Delaware, Lackawanna & Western Railroad Company, the Pennsylvania Railroad Company, and the Lehigh Valley Railroad Company. Bills dismissed, and petitions for writs of mandamus denied.

Charles J. Bonaparte, Atty. Gen., and T. C. Spelling, and L. Allison Wilmer, Sp. Asst. Attys. Gen., for the United States.

James H. Torrey, James M. Beck, and Wm. S. Opdyke, for Delaware & H. Co.

George F. Brownell and Adelbert Moot, for Erie R. Co.

Jackson E. Reynolds and Robert W. de Forest, for Central R. R. of N. J.

John L. Seager and W. S. Jenney, for Delaware, L. & W. R. Co.

Francis I. Gowen, George V. Massey, and John G. Johnson, for Pennsylvania R. Co.

Frank H. Platt and J. F. Schaperkotter, for Lehigh Valley R. Co.

Before DALLAS, GRAY, and BUFFINGTON, Circuit Judges.

GRAY, Circuit Judge. There have been filed in this court on behalf of the United States, by the Attorney General thereof, six bills in equity against the railroad corporations, defendants respectively, as named in the cases set forth in the caption—the Delaware & Hudson Railroad Company and the Erie Railroad Company being corporations by and under the laws of the state of New York; the Central Railroad Company a corporation by and under the laws of the state of New Jersey; and the Delaware, Lackawanna & Western Railroad Company, the Pennsylvania Railroad Company and the Lehigh Valley Railroad Company, corporations by and under the laws of the state of Pennsylvania. There were also filed at the same time, on behalf of the United States, at the relation of the said Attorney General, under the authority of the act of Congress, entitled "An act to regulate commerce," approved February 4, 1887, and of acts amendatory thereof, petitions for mandamus against the said defendants respectively. Both the bills in equity and the petitions for mandamus are founded upon the same acts in alleged violation, or threatened violation, by the defendants respectively, of one of the provisions of section 1 of the said act to regulate commerce, approved February 4, 1887 (Act Feb. 4, 1887, c. 104, 24 Stat. 379 (U. S. Comp. St. 1901, p. 3154]), as amended June 29, 1906 (Act June 29, 1906, c. 3591, 34 Stat. 584 [U. S. Comp. St. Supp. 1907, p. 894]), the said provision being as follows:-

"From and after May first, nineteen hundred and eight, it shall be unlawful for any railroad company to transport from any state, territory, or the District of Columbia, to any other state, territory, or the District of Columbia, or to any foreign country, any article or commodity, other than timber and the manufactured products thereof, manufactured, mined, or produced by it, or under its authority, or which it may own in whole, or in part, or in which it may have any interest direct or indirect except such articles or commodities as may be necessary and intended for its use in the conduct of its business as a common carrier."

These charges of violations of this so-called "commodities clause" are, as we have said, the same in the bill in equity as in the petition for mandamus against each defendant. It is, in substance, charged in the bill and petition against each defendant, that it operates, and has been operating, long prior to the said 8th day of May, 1906, a railroad or railroads in and through the anthracite coal fields of the state of Pennsylvania, and into New Jersey, New York and other states, and, as a common carrier through all said period, has been engaged in interstate transportation of the article or commodity known as anthracite coal, from the mines and mining lands in the state of Pennsylvania to the said other states; that as to some of said defendants, the coal so transported has been in large measure owned, in whole or in part, by them, either through purchase, or as being the product of their own mines and coal lands. It is also charged in each of said bills and petitions, that the defendant has been engaged during the period aforesaid in the interstate transportation of coal, in which it had an interest, direct or indirect, by reason of its ownership of the stock of other companies owning or mining and producing the coal; and generally, that by continuing such interstate transportation of said coal, as aforesaid, each defendant has acted in violation of the said "commodities clause," by so transporting an article or commodity, other than timber and the manufactured products thereof, owned by said defendant in whole or in part, or in which it has or will have an interest, direct or indirect, or which has been mined or produced by it or under its authority, and which article or commodity is not necessary or intended, and will not be necessary and intended "for its use in the conduct of its business as a common carrier."

Each bill seeks to enjoin the defendant therein from further transporting in interstate commerce the anthracite coal, which it alleges it is the purpose of said defendant to transport, as thereinbefore stated, and each petition for mandamus prays for the issuance of an alternative writ, commanding and directing the defendant therein to forthwith and hereafter comply with the provisions of the law, hereinbefore quoted, by forthwith and thereafter ceasing and refraining from transporting in interstate commerce, as therein alleged, the anthracite coal which, as is alleged, it is the purpose of the defendant to transport, or to appear and show cause, etc.

To these several bills and petitions, answers have been filed by the defendants therein, respectively. In these answers, it is admitted, generally, by the defendants, that the allegations in the bills and petitions as to their corporate existence, are true, and that they own or operate railroads engaged in the interstate transportation of coal from the anthracite region of Pennsylvania. They also admit that this transportation has been carried on by the several defendants long prior to the 8th day of May, 1906, and in the case of some of them, for a period varying from a quarter to more than half a century prior thereto. In addition to these general admissions, detailed statements are made by the defendants, respectively, of the character and extent of the ownership or other interest possessed by them in the coal so trans-

ported, or in the lands or mines from which it is produced. It is only necessary to briefly summarize these statements:

(1) The Delaware & Hudson Company alleges that it directly owns its coal lands as it does its railroad; that it was incorporated by an act of the Legislature of the state of New York, April 23, 1823 (Laws 1823, p. 305, c. 238), and was "authorized to construct a canal or water navigation from the anthracite coal district in Pennsylvania to the Hudson river in New York; to purchase lands in Pennsylvania containing stone or anthracite coal; and to employ its capital in the business of transporting to market coal mined from such lands." That this authority was also expressly conferred by acts of the Legislature of the state of Pennsylvania, between the years 1823 and 1871, and that these acts of the state of Pennsylvania resulted from the desire and policy of said state to create and foster the industry of mining such coal and developing the transportation thereof; that under the authority of these statutes of Pennsylvania and of New York, the said defendant, beginning as early as the year 1825, invested its capital in the purchase of a large quantity of coal lands in the state of Pennsylvania and in the construction of canal navigation in Pennsylvania from the Delaware river to the Hudson river; that later, under statutes of both states, it invested additional capital in the construction of railroads in the state of Pennsylvania, and in the construction and acquisition of railroads and leasehold estates in the state of New York, for the same general purpose of transporting coal from the coal lands owned by it; that it has invested large sums of money, not only in the acquisition of coal property, but in the erection of structures for mining and terminal facilities; that some of its coal properties were acquired under leases upon royalties payable to the lessors for each ton of coal mined, the leases fixing large minimum amounts by way of rent; that large fixed rentals are required to be paid, not only for those mining lands but for railroads acquired for the purpose of transporting coal; that there are three coal companies whose shares are practically all owned by it, viz., the Northern Coal & Iron Company, the Jackson Coal Company, and the Hudson Coal Company; that its mining lands thus owned and acquired are located upon or contiguous to the railroads of defendant; that said railroads are the only reasonable, practical, and conveniently available avenues of transportation whereby the coal by it produced can be transported in interstate commerce and the coal mined by the defendant and by said coal companies upon its lines of railroad amounts approximately to 70 per cent. of the entire transportation by it, or to about 4,300,000 gross tons, its daily shipments averaging about 12 trains of 37 coal cars each; that the coal lands so acquired by the defendant and by said three coal companies would have little, if any, value, except for the mining of coal therefrom and its sale as a commercial commodity, and that if it is deprived, by virtue of the said act of Congress, of the right to transport said coal, it will be deprived of the only possible enjoyment of its property. It further avers that it is not a "railroad company" within the meaning of the act of Congress, but that it is a coal company, and that since the year 1870 it has become, incidental-

ly to its business as a coal mining company, a common carrier by railroad of passengers and property.

It is further averred, as a special ground of defense by the said Delaware & Hudson Company, that this said "commodities clause" does not apply to it, because all the coal mined by it upon its own lands, and upon the lands of the said three coal companies (except as to steam sizes, as thereafter stated) "is sold, before transportation thereof begins, by said company to third persons at the mines in Pennsylvania from which such coal has been produced, and that said company does not, at the time when the same is so transported by it in interstate commerce, own the same nor any interest therein, direct or indirect, apart from its obligation and rights as a common carrier in the transportation thereof, and that it carries said coal for the account of the purchaser thereof, who is the consignor and owner of said coal."

(2) The answer of the Erie Railroad Company states that it was originally organized under the laws of the state of New York, in 1832 (Laws 1832, p. 190, c. 129); that it has been reorganized from time to time under mortgage foreclosure, and finally, in November, 1895, under a foreclosure sale, it was reorganized under the statutes of New York, whereby it "became the lawful owner of the property, rights, privileges, immunities and franchises of all its predecessors aforesaid, including the shares of capital stock of coal companies and of railroad companies, as well as the railroads theretofore held and possessed by said predecessor companies, the railroads so owned by it and its said subsidiary companies having an aggregate mileage of over 2,100 miles in the states of New York, Pennsylvania, New Jersey, Ohio, Indiana and Illinois"; that the Pennsylvania Coal Company was created a corporation by the laws of Pennsylvania, in 1838 (P. L. 1837–38, p. 434, § 14), its charter giving it the right of "transacting the usual business of companies engaged in mining, transporting to market and selling coal and the other products of coal mined," and for that purpose, it was given the power to purchase or lease coal lands in Pennsylvania; also the power to construct railroads with one or more tracks. In 1853 (Act March 15, 1853 [P. L. 196]) the said Pennsylvania Coal Company was authorized to extend its railroad to connect with the New York & Erie Railroad. The right of said Pennsylvania Coal Company to buy coal lands and build railroad connections was continued by acts of the Legislature of Pennsylvania, in 1857 (Act March 10, 1857 [P. L. 72]), 1864 (Act April 14, 1864 [P. L. 430]), 1867 (Act April 2, 1867 [P. L. 670]), and 1868 (Act April 14, 1868 [P. L. 1082]); that in pursuance of these various acts of the Legislature, the Pennsylvania Coal Company obtained capital, issued stock therefor, acquired coal lands, developed coal mines, produced, transported to markets, and sold coal, built and operated railroads, made railway connections, as authorized, and did other like acts to promote the business of supplying all persons needing the same with anthracite coal. The Hillside Coal & Iron Company was organized by an act of the Legislature of the state of Pennsylvania, in 1869 (Act April 12, 1869 [P. L. 1312]), for the purposes and with powers similar

to those of the Pennsylvania Coal Company. Under authority of acts of the Legislature of Pennsylvania, the said Erie Railroad Company, long prior to the passage of the said amendment to the interstate commerce act, acquired substantially all the capital stock of said Pennsylvania Coal Company, the Hillside Coal & Iron Company, the Jefferson Railroad Company and Erie & Wyoming Railroad Company, and a small minority of the stock of the Temple Iron Company, and has pledged the same under various mortgages, pursuant to which have been issued and are now outstanding, bonds for large sums, aggregating many millions of dollars, which bonds are held by purchasers in good faith and for value throughout the world; that for many years prior to May 1, 1908, it has been engaged in transporting the coal of said corporations to markets outside the state of Pennsylvania, many of which can only be reached from the railroad lines of this defendant; that the coal so transported amounts annually to several millions of tons and constitutes 22 per cent. of the entire freight tonnage of this defendant, the Erie Company. It also denies that it is, by reason of the ownership of said stock in said companies, the owner in whole or in part of the coal transported by it in interstate commerce, or that it has or had any interest, direct or indirect, therein, and therefore has not violated or failed to comply with the so-called "commodities clause" of the interstate commerce act.

(3) The Central Railroad Company of New Jersey avers that it was organized under the laws of the state of New Jersey, and by these laws was authorized to purchase and hold the stock or securities of any other corporation, of New Jersey or elsewhere, and that it was also so authorized by two acts of Assembly of the state of Pennsylvania, one of which, approved April 15, 1869 (P. L. 31), was entitled "An act to authorize railroad and canal companies to aid in the development of coal, iron, lumber, and other material interests of this commonwealth"; that pursuant to the authority of these several acts, it had, long prior to the said act of Congress, become the owner of a majority of the shares of the capital stock of the Honeybrook Coal Company and of the Wilkes-Barre Coal & Iron Company, both companies now being merged into the Lehigh & Wilkes-Barre Coal Company, a large majority of whose shares are owned by it; that it also owns a minority of the shares of the Temple Iron Company; that in 1871, it became the lessee of the Lehigh & Susquehanna Railroad, a Pennsylvania corporation, which it has ever since operated under an obligation to pay a yearly rental of not less than $1,414,400 and not to exceed $2,043,300 per annum; that its gross earnings from the transportation of coal amounted, for the year ending June 7, 1907, to $9,312,268.04, being 48 per cent. of its entire freight receipts, and that a large part of its earnings from freight and miscellaneous passenger traffic is incident to and dependent upon the operation of the mines and collieries of said coal companies, and that the greater part of its earnings from transportation of coal comes from its carriage of the coal mined by the Lehigh & Wilkes-Barre Coal Company, and that large sums of money have been expended by it in extending its

lines and in constructions to enable it to transport said coal in interstate commerce.

(4) The Delaware, Lackawanna & Western Railroad Company, like the Delaware & Hudson Company, admits that it is the owner of coal lands, and mines coal which it sells; that it was organized under an act of the Legislature of Pennsylvania in 1849 (Act Feb. 19, 1849 [P. L. 79]); that all the lines of railroad owned by it, are wholly within the state of Pennsylvania, extending from the Delaware river, at the boundary line of the state of New Jersey, in a northwesterly direction across the state of Pennsylvania, to the boundary line between the state of Pennsylvania and the state of New York, with a branch line extending from Scranton, in the state of Pennsylvania, to Northumberland in said state. Said defendant also admits and alleges that, under express authority of acts of the Legislatures of the states of Pennsylvania, New Jersey and New York, it, as lessee, now operates, and long prior to May 1, 1908, had operated, various lines of railroad in the two last mentioned states, by which it has direct traffic connection with the city of Buffalo and other cities in the said states. Defendant also admits that for many years it has owned, in fee, extensive tracts of coal land in the state of Pennsylvania; that it has also leased large tracts of coal land in the said state, and is now engaged, and for many years last past has been engaged, in mining coal from the lands so owned and leased by it; that the holding of said lands, whether in fee or by lease, and the mining, manufacture and interstate transportation of the coal therefrom, has been and continues to be under and by virtue of the authority of the laws of the state of Pennsylvania; that in addition to the foregoing, certain coal companies, organized from time to time under acts of assembly of the said state of Pennsylvania, have been merged into said defendant corporation; that by an act of the General Assembly of the state of Pennsylvania, approved April 15, 1869, entitled "An act to authorize railroad and canal companies to aid in the development of the coal, iron, lumber, and other material interests of this commonwealth," the defendant was authorized to aid corporations authorized by law to develop coal, iron, lumber, and other material interests of Pennsylvania, by the purchase of their capital stock or bonds, or either of them. The answer of said defendant also alleges that, by reason of its ownership of said coal lands and coal, and the revenues derived from the transportation of the same to market, it has been enabled to expend millions in the betterment of its general transportation facilities for both goods and passengers, and give to the public the benefits of a well constructed and equipped modern railroad. That by virtue of leases of railroads, to enable it to transport coal in interstate commerce, it has become bound to pay yearly, in interest charges, the sum of $5,155,697, and for taxes $1,163,916. That out of a total of about 8,700,000 tons of coal produced by it in the year 1907 from its land owned in fee and leased, upwards of 6,700,000 tons were transported over its lines of railroad in interstate commerce; that from 40 per cent. to 60 per cent. of its annual transportation earnings, from the operation of leased lines, has been derived from the carriage of its own coal thereover. That

it uses, in the conduct of its business as a common carrier, approximately 1,700,000 tons of anthracite coal, of pea size or smaller, annually, and will require more for such use in the future; that to obtain this coal in these economic sizes, it is necessary to break up coal, leaving the larger sizes which must be disposed of otherwise; that great waste would result if it were forbidden to transport to market in interstate commerce these larger sizes thus resulting. That defendant's rights to acquire its holding of coal land, its rights to own and mine coal and to transport the same to market in other states as well as in Pennsylvania, and its leases of other railroads, were acquired many years prior to the enactment of the so-called "interstate commerce act," and of the said amendment thereto known as the "commodities clause."

(5) The answer of the Pennsylvania Railroad Company avers that it was incorporated under the laws of the state of Pennsylvania April 13, 1846 (P. L. 312); that as early as 1871, under authority of two general statutes of the state of Pennsylvania, it became the owner of all the shares of the Susquehanna Coal Company, of all the shares of the Summit Branch Mining Company, and of one-third of the shares of the Mineral Railroad Mining Company, corporations of the state of Pennsylvania; that since the last mentioned year, and up to the present time, it has carried the coals produced from the mines of the said coal companies, at lawfully established schedule rates, over its lines of railroad; that approximately 65 per cent. of the coal so mined has been carried to destinations outside the state of Pennsylvania; that it mines no coal, but that the coal it carries is mined by the said coal companies, and that it has no interest therein within the meaning of the said act of Congress, either direct or indirect; that the most largely producing of the properties belonging to these coal companies are located either directly upon, or so contiguous to the system of railroads operated by said defendant, as to render transportation by any other railroads not reasonably practicable.

(6) The answer of the Lehigh Valley Railroad Company states that it was originally incorporated September 20, 1847, under the laws of the state of Pennsylvania. Under the authority of various acts of assembly of the said state, other railroad and coal companies, prior to the year 1874, have been merged into it, some of which railroads were expressly authorized to construct railroads and to carry on the business of mining, transporting and vending coal. It is also the lessee of railroads in Pennsylvania; that by means of its own and of said leased lines of railroad, it conducts, and for many years has conducted, an interstate transportation of coal; that since 1872, pursuant to authority conferred by the laws of Pennsylvania, it has also owned the majority of the capital stock of the New York & Middle Coal Field Railroad & Coal Company, a corporation of the state of Pennsylvania; also the entire capital stock of Coxe Bros. & Co., a corporation of said state; a minority interest in the capital stock of the Highland Coal Company; a majority of the stock of the Locust Mountain Coal & Iron Company; a minority interest in the capital stock of the Packer Coal Company, and of the Temple Iron Company, all corporations of the state of Pennsylvania, organized for the pur-

pose of mining coal, some of them more than half a century ago; that it has constructed lines of railroad and branch railroads and terminal facilities, for the purpose of transporting to market, in interstate commerce, the coal of the companies whose shares it owns, and this business has been conducted by it for many years; that practically said coal can be transported to market only by its railroads; that the capital stock of two of the coal companies owned by said defendant has been transferred to a trustee, to hold under a general mortgage executed by defendant, under which mortgage bonds to the amount of $23,539,000 have been issued by said defendant and are now outstanding in the hands of the public; that the capital stock of Coxe Bros. & Co., Incorporated, owned by this defendant as aforesaid, has been transferred and assigned to, and is now held by, a trustee under a collateral trust agreement executed by said defendant, dated November 1, 1905, for the purpose and upon the terms expressed in said agreement, a copy of which is annexed to said answer, and that bonds to the amount of $18,000,000 have been issued under said agreement and are now outstanding in the hands of the public; that said defendant transports, annually, in interstate commerce, upwards of 7,600,000 tons of anthracite coal, shipped by the said coal companies whose stock is owned by said defendant, in whole or in part as aforesaid, and transports, annually, for said coal companies, wholly within the state of Pennsylvania, upwards of 1,500,000 tons; that nearly 42 per cent. of its gross annual earnings of $36,068,431, for the last fiscal year, or $15,110,899, were derived from coal freights, which represented over 51 per cent. of its entire freight tonnage; that the greater part of its gross earnings from coal transportation was received from the coal companies whose shares are by it owned; that the mines and collieries of said coal companies are all so located in the portions of the coal fields tributary to its lines of railroad, that no means of transporting their product can be made available, except by defendant's railroads; that the railroad lines of this defendant have been from time to time extended, the control of other railroads acquired, and its facilities and equipment increased at enormous expense, in reliance upon the rights and franchises conferred by the statutes of Pennsylvania aforesaid; that a very large part of defendant's earnings is derived from the freight and passenger traffic incidental to and dependent upon the operation of the mines and collieries of said coal companies, and that if said defendant were deprived of the earnings derived from the transportation of the coal of said coal companies, its business could not be continued, except at a net loss of many millions of dollars per annum.

These cases have all been submitted to the court upon the bills and answers in the cases in equity and the petitions and answers in the mandamus proceedings; the statements of fact, therefore, contained in these answers, must be taken to be true. There is no disagreement, however, as to any of the material facts, whether stated in the bills and petitions or in the answers, or as to those general facts of economic and industrial history of which judicial notice can be taken. The questions of law arising out of these facts, in each of the cases,

are of such a character that they were heard, and will now be considered, together. Some of the questions raised and stated in the answers are in a measure special and peculiar to individual cases, and arise out of the extent and character of the ownership, or of the interest, direct or indirect, existing as to the coal, which of course is the commodity here in question transported in interstate commerce.

The fundamental and underlying question, however, which presents itself at the threshold of all the cases for our consideration, is, whether the so-called "commodities clause," amendatory of the act to regulate commerce, passed June 29, 1906, so far as its scope applies by the universality of its language to the cases here presented, is in excess of the legislative authority granted to Congress by the Constitution. This question must be considered with reference to the Constitution as a whole, and in relation to the concrete facts of the several cases. It is therefore necessary to keep in mind the situation as presented by these defendants, the facts set forth in their individual answers, as above briefly summarized, and the relevant industrial conditions which, being matters of common knowledge, may be judicially noticed.

The general situation is, that for half a century, or more, it has been the policy of the state of Pennsylvania, as evidenced by her legislative acts, to promote the development of her natural resources, especially as regards coal, by encouraging railroad companies and canal companies to invest their funds in coal lands, so that the product of her mines might be conveniently and profitably conveyed to markets in Pennsylvania and in other states. Two of the defendant corporations, as appears from their answers, were created by the Legislature of Pennsylvania, one of them three-quarters of a century ago and the other half a century ago, for the expressed purpose that its coal lands might be developed and that coal might be transported to the people of Pennsylvania and of other states. It is not questioned that, pursuant to this general policy, investments were made by all the defendant companies in coal lands and mines, and in the stock of coal producing companies, and that coal production was enormously increased, and its economies promoted, by the facilities of transportation thus brought about. As appears from the answers filed, the entire distribution of anthracite coal in and into the different states of the Union and Canada, for the year 1905 (the last year for which there is authoritative statistics), was 61,410,201 tons; that approximately four-fifths of this entire production of anthracite coal was transported in interstate commerce over the defendant railroads, from Pennsylvania to markets in other states and Canada, and of this four-fifths, from 70 per cent. to 75 per cent. was produced either directly by the defendant companies or through the agency of their subsidiary coal companies. It also appears from the answers filed, that enormous sums of money have been expended by these defendants, to enable them to mine and prepare their coal and to transport it to any point where there may be a market for it. It is not denied that the situation thus generally described is not a new one, created since the passage of the act in question, but has existed for a long period of years prior thereto, and that the rights and property interests acquired by

the said defendants in the premises have been acquired in conformity to the Constitution and laws of the state of Pennsylvania, and that their right to the enjoyment of the same has never been doubted or questioned by the courts or people of that commonwealth, but has been fully recognized and protected by both.

To this situation, the complainant contends the fifth paragraph of the first section of the act to regulate commerce, as amended by the act of June 29, 1906, applies, and strikes with illegality the conduct by the defendants of this enormous business, as above described—a business harmless in itself, and of immense importance to the consumers of coal. We again quote this so-called "commodities clause":

> "From and after May first, nineteen hundred and eight, it shall be unlawful for any railroad company to transport from any state, territory, or the District of Columbia, to any other state, territory, or the District of Columbia, or to any foreign country, any article or commodity, other than timber and the manufactured products thereof, manufactured, mined, or produced by it, or under its authority, or which it may own in whole, or in part, or in which it may have any interest direct or indirect except such articles or commodities as may be necessary and intended for its use in the conduct of its business as a common carrier."

The legislative will could hardly be expressed more unequivocally. There is no room for doubt as to the meaning and practical effect of the clause in question. By it, each of the defendants is forbidden to transport in interstate commerce any of the coal (a) "mined or produced" by it; (b) "mined or produced under its authority;" or (c) "which it may own in whole or in part;" or (d) "in which it may have any interest, direct or indirect; except such as is necessary or intended for its own use in the conduct of its own business."

It results, therefore, that the coal described in the foregoing categories is outlawed in interstate commerce, and must remain so, unless the defendants can divest themselves of all title or interest in the coal, coal lands, or coal companies, from which the markets in other states have been so largely supplied. The enforcement of the act must, of necessity, result, either in the defendants holding their coal properties and refraining from transporting coal to other states, and confining themselves to the mining of such coal as may be used in the state of Pennsylvania, or in their divesting themselves of all title or interest, direct or indirect, in said properties, by sale or surrender thereof, as they may be able to accomplish the same. The population of the region outside of Pennsylvania, absolutely dependent upon the use of anthracite coal for domestic or industrial purposes, is very large, and has been, no doubt moderately, estimated at from 12,000,000 to 15,000,000. The adoption of the former alternative, therefore, would entail, while it continued, an amount of suffering and deprivation that it is hard to forecast or appreciate, while the forced resort to the other would necessarily inflict upon the defendants and their stockholders, a most disastrous sacrifice and pecuniary loss.

That the enforcement of a law should result in loss and inconvenience to individuals, few or many, does not, of course, impugn the legislative authority to enact such law, but it may well serve to challenge the serious consideration, not only of the legislative body which enacts

164 F.—15

it, but, of courts who are required to pass upon the question, whether indeed it be a valid law or not.

Congress, of course, is vested only with such legislative powers as are specifically enumerated in the Constitution, together with such as are necessary and proper to carry the same into execution, and it is admitted that, if constitutional sanction exists for the passage of the law in question, it must be found in that clause of the eighth section of article 1 of the Constitution, declaring that Congress shall have power "to regulate commerce with foreign nations, and among the several states, and with the Indian tribes."

Upon several grounds, counsel for defendants contend that the said "commodities clause" of the act of June 29, 1906, was not a valid exercise of the power conferred upon Congress by this clause of the Constitution. No other part of the Constitution has been the subject of more judicial consideration and discussion, and no other grant of power has been more frequently invoked to sustain legislation by Congress upon subjects affecting the conduct and business of the citizens of a state, and which theretofore had been left exclusively to state control. Much of this legislation has not only passed the scrutiny of the Supreme Court, but has been admittedly beneficial in its results. The importance and influence of the commerce clause of the Constitution has not only been felt in the direct legislation by Congress which it has authorized, but also in the restraint that it has placed upon state legislation, which has tended to affect or control interstate or foreign commerce.

It is not surprising, therefore, that with the growth of population and the increasing importance of the interstate business of the country, there should be an increasing frequency in the exercise by Congress of the power thus conferred, and the legislative records of Congress show a still greater frequency in the proposals for such enactments, which have failed to receive legislative sanction. These considerations serve to emphasize the importance of the duty devolved upon the courts, as well as upon Congress, to carefully compare every such enactment with the scope and intent of the constitutional power invoked therefor.

Fully appreciating the serious responsibility that is imposed upon the court in these cases, and recognizing fully the presumption of validity accorded to legislative acts, we turn to the question raised by defendants, as already stated, viz., whether the so-called "commodities clause," amendatory of the act to regulate commerce, passed June 29, 1906, is, so far as its scope applies by the universality of its language to the cases here presented, a constitutional and valid enactment,—one within the legislative authority granted to Congress by the Constitution.

Ample as is the scope of legislative power granted by the language of the commerce clause, and far as the Supreme Court has undoubtedly gone in sustaining the validity of legislation under it, we think it may be safely said that no assertion of this power hitherto, by Congress, has been so far-reaching, or affected in so serious a degree the individual liberty and property rights enjoyed under the Constitution

and laws of a state, as the enactment we are here considering. It is not to be denied that the right to carry in interstate commerce coal which they own in whole or in part, or which is mined or produced by them or under their authority, or by coal companies in which they are stockholders, was, until the passage of the act in question a lawful right of these defendants; that it was a common right of property, neither denied nor disputed by the common or statute law of Pennsylvania; that it was a most important property right, the enjoyment and exercise of which was neither criminal nor immoral, and subject only to any restraints imposed upon its possessors by the common or statute law of the state, or by the then existing statutes of the United States, so far as they were engaged in interstate commerce. If in any manner and to any extent whatever, they have actually violated the latter, surely they could be restrained, or otherwise made amenable to the legal penalties in such behalf, without crippling or destroying a business in which they are profitably and usefully engaged. We must, however, assume for the purposes of this discussion, in the absence of any assertion to the contrary, that these defendants have regularly complied with and conformed themselves to all the legal requirements of the interstate commerce law, touching the business in which they are engaged.

To these defendants, thus innocently and lawfully engaged in transporting coal which they own, or are interested in to the extent and under the circumstances hereinbefore set forth, comes this act of Congress, and declares that this whole business is unlawful, and that the future exercise of a vested right of ownership, which they have heretofore and for long periods of years enjoyed, under the belief that it was an ordinary right of property enjoyed innocently by all citizens of the state alike, and inviolable as such, is a crime, and punishable as such. That this legislation is drastic and harsh, does not, of course, dispose of the question of power on the part of Congress to enact it. Many laws, clearly within the legislative power to enact, may result incidentally in loss or inconvenience to individuals and to particular interests. The first inquiry to be made, therefore, is as to whether this legislation is a regulation of commerce, within the true meaning of the commerce clause of the Constitution. It is contended that the power to regulate commerce assumes the continued existence of the thing to be regulated, and does not include the power to destroy or inhibit it, at least if the commerce inhibited is not criminal, immoral, or injurious to public health, morals, or safety. If we pass for the present this contention, the question remains, whether this power is an absolute one, and without any limitation upon its exercise, other than the will of the legislative branch of the government.

It is impossible to consider this question, without recurring to the often quoted language of Chief Justice Marshall, in Gibbons v. Ogden, 22 U. S. 1, 6 L. Ed. 23, that:

"This power, like all others vested in Congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations other than are prescribed in the Constitution."

Further on, the Chief Justice, in speaking of the plenary character of the specific powers granted to Congress, said:

"The wisdom and discretion of Congress, their identity with the people, and the influence which their constituents possess in elections, are the sole restraints on which they have relied to secure them from their abuse."

This language is repeatedly quoted in the arguments and briefs on behalf of the government, in support of the contention that this power to regulate, etc., is in effect an unlimited and absolute one. But surely it would be unreasonable to suppose that the Chief Justice had in mind, as subject to abuse, any unlimited or absolute power, but only such power as it existed under the grant of the Constitution, carrying with it such limitations as might be inherent in its nature or be prescribed in the Constitution itself. "Plenary power" may exist within such limitations, and though clearly liable to abuse within its permitted bounds, such abuse can only be corrected through the control possessed by the people at the elections. To deduce from the language quoted, authority for this contention of the government, is to attribute to the great Chief Justice opinions contrary to his expressed understanding of our dual scheme of government, and constitute him a champion of an absolutism abhorrent to the genius and character of our institutions. The contention also ignores the qualifying language contained in the description of the power to regulate commerce, above referred to, where it says that "it acknowledges no limitations other than are prescribed in the Constitution." This extreme contention must also ignore the like qualifying language, when it quotes, as it does with great emphasis, from the same opinion, the statement that:

"The power over commerce * * * among the several states is vested in Congress as absolutely as it would be in a single government *having in its Constitution the same restrictions on the exercise of power as are found in the Constitution of the United States.*"

We have italicized these concluding words, because they express a clear recognition by Chief Justice Marshall of the fact that the Constitution itself places limitations on the power to regulate commerce, granted by it to the Congress. But, recognizing, as he does, that these limitations exist, he says in this connection, that they do not affect the questions then before the court, and for that reason they were not further considered, the sole question for consideration in that case being, whether the power given to Congress to regulate commerce was exclusive, or concurrent with a like power in the state of New York, by which it assumed to deprive citizens of other states of the right to navigate the navigable waters within the jurisdiction of said state.

We may assume, therefore, that the commerce clause of the Constitution is no exception to the general doctrine, that unlimited power has no place in American governmental institutions, and that there are rights of liberty and property that are secure against hostile legislative action. As has been well said:

"In a constitutional government, limitation is the abiding principle, exhibited in its highest form in the Constitution, as the deliberative judgment

of the people, moderating every claim of right or use of power." Prentice on Police Power.

No one can read the history of the formation of the Constitution, and of the conditions from which it sprang, without being impressed with the fact that the desire to preserve the individual right of the citizens of each state, to enjoy, untrammeled, that right of property which consisted in the ability to transport it into other states, free from the inhibitions and harassments that might theretofore have been imposed by the regulations of such other states, was one of the most important, if not the principal, of the impelling causes that brought about the Convention of 1787. In contemplating this history, the thought cannot be avoided that, in conferring upon Congress, and in denying to the states, this power of interstate regulation, it was meant to preserve, and not to destroy or impair, this important right of property so essential to its full enjoyment, and to the individual liberty of which it is a part.

These reflections are pertinent as a preparation for the inquiry, does the Constitution prescribe any limitation on the power of Congress, as asserted by the enactment in question, of which these defendants can lawfully avail themselves?

The first ten amendments to the Constitution were admittedly intended to prevent abuse of the powers granted to the general government, and of these, the fifth, among other things, provides:

"Nor shall any person * * * be deprived of life, liberty or property without due process of law, nor shall private property be taken for public use without just compensation."

These inhibitions serve as a limitation upon the exercise of federal power, whether legislative, executive or judicial, and it is not surprising that they should be invoked as a protection against any action of the federal government, supposed to be injurious or destructive of the rights thus protected. No more serious and responsible duty can be imposed upon this or any court, than of determining whether, as to any given assertion of its legislative will, Congress has or has not transcended the limitations of the Constitution. In the opinion of this court, the enactment in question is not a regulation of commerce, within the proper meaning of those words, as used in the commerce clause of the Constitution, and therefore not within the power granted by that clause. It never has been decided that the power conferred upon Congress to regulate interstate commerce may be so expanded by construction as to warrant the prohibition of such commerce under all circumstances; and to us it does not seem to be reasonably possible that it should be. Moreover, this power, whatever its scope, certainly is subject to the limitations contained in the Constitution, and this can be said with especial emphasis as to those limitations found in amendments adopted after the ratification of the Constitution. Carroll v. Greenwich Ins. Co., 199 U. S. 401–410, 26 Sup. Ct. 66, 50 L. Ed. 246.

It seems perfectly plain, then, that Congress cannot, in the exercise or pretended exercise of any legislative power conferred upon it, deprive any person within its jurisdiction of his liberty or property, without due process of law, nor can it be questioned that, with the

possible exception of the war power, this is true, no matter under color of what power such deprivation is sought to be accomplished. No argument should be necessary, therefore, to show that this cannot· be accomplished by an enactment in assertion of ' power under the commerce clause of the Constitution. Counsel for the government, however, contend that any enactment of Congress which purports to regulate interstate commerce, and which actually does control, restrain or prohibit the same, or some part thereof, is such an exercise of power under the commerce clause of the Constitution as is subject to no limitation whatever, and cannot be challenged by any person, on the ground that it is violative of the inhibitions contained in the fifth amendment. In other words, if it be on its face a regulation of commerce, no right of personal liberty or property can stand in the way of its enforcement, but, on the contrary, every such right is only held and enjoyed, subject to the will of Congress in the exercise of its power to regulate interstate commerce.

This is a startling proposition, but is, as we think will appear, a necessary premise to the conclusion contended for by the government. It is admitted, by counsel for the government, that it has never yet been directly asserted in any decision of the Supreme Court, but they contend that it is deducible from certain judgments of that court, and is necessary to that fullness and completeness of control over commerce, which, begging the question, they say it was the intention of the Constitution to grant. It may avail nothing to say that it has never heretofore been imagined that a power so formidable as this lay dor-. mant in the Constitution, ready to be aroused and exercised at the arbitrary will or caprice of Congress, because it is true that, in the development of our modern life, clearly existing powers that have lain dormant, or have only been partially exercised, have been made applicable to conditions unforeseen by those who framed the Constitution, but in these cases, the powers invoked have clearly existed, and were not predicated upon the supposed exigencies for their exercise. The consequences of establishing such a proposition as one of constitutional law, may well be considered, if they be of such a character as to throw light on the intention of those who framed the Constitution, or to render it improbable that they ever meant to grant in the premises the absolute and unlimited power contended for.

It may be safely said, and we have before remarked, that the legitimate exercise of no legislative power granted by the Constitution, is capable of touching at so many points, and in such a variety of ways, the every day life and business of the citizen. It is easy to see, therefore, that if it be subject to none of the limitations of the Constitution, and especially if the constitutional guaranty of life, liberty and property are of no avail to the citizen, rights which we have considered as most sacred and most secure may be overthrown and destroyed wantonly or arbitrarily by the will of Congress, provided that will is manifested by a regulation of commerce. It is small comfort to those who hate arbitrary or despotic power, to say that when Congress, by an enactment; has deprived the citizen of liberty or property without due process of law, it was but expressing the will of their constituents.

We have, since the foundation of the government, rested secure in the belief that there are rights which the people themselves have placed beyond the power of governmental agencies, or of the majorities for the time being behind them, to impinge upon or destroy. The provision in the fifth amendment, declaring that no person shall be deprived of life, liberty or property without due process of law, would be a mere "rhapsody of words," without force or meaning, if so far-reaching and important a legislative power as the one we are discussing can be exercised without regard to its inhibition.

It does not detract from the force of these observations to recognize that, in the consideration and enforcement of these limitations, and of those on the states in the fourteenth amendment, the Supreme Court, as we shall presently see, has given to them that wise and common sense application to concrete cases, as they arose, as makes them consistent with, and not destructive of, the practical efficiency of the powers granted by the Constitution or reserved to the states. The Constitution of the United States was intended for the common understanding of the people. The plain and obvious meaning of the words employed are to be accepted, unless plain reason to the contrary appears in the text of the Constitution itself. Life, liberty and property are ranked together under the protection of the fifth amendment, and by the exigence of its command, a person can no more be deprived of his property than he can be deprived of his life or his liberty, without due process of law.

But, if the contention of the government be sustained, that. in regulating interstate commerce all the consequences, direct as well as indirect and incidental, that injuriously affect the property of a citizen, may be disregarded without respect to their character, the same must be true as to those consequences that affect his liberty. Indeed, the property rights of the citizen are a part of his personal liberty. So that, a regulation of interstate commerce, not merely affecting the mode or manner of transportation, but excluding from interstate transportation altogether certain classes of persons, or imposing conditions on such transportation as would wantonly and arbitrarily affect personal liberty, would have to be sustained, and even life itself might be put in peril without redress. Here again, it is not enough to say, as does the counsel for the government, either that it is an impossibility that Congress would proceed to such an extreme, or that those who so legislated would be thereafter rejected at popular elections. The amendment we are considering, makes it impossible for either Congress or their constituents to do any of these things, and the deprivation of life, liberty or property, without due process of law, is placed by the Constitution beyond the reach of majorities, as well as beyond the power of governmental agencies.

It is not denied that corporations are persons, within the provisions of the fifth, as well as of the fourteenth, amendment (Gulf, C. & S. F. Ry. Co. v. Ellis, 165 U. S. 150, 154, 17 Sup. Ct. 255, 41 L. Ed. 666), and in the cases before us, it is claimed that the enforcement of the provisions of the so-called "commodities clause" will violate this inhibition of the fifth amendment, as to these defendants, and that its

enactment is therefore invalid. The facts set forth in the several answers become pertinent and necessary to the proper consideration of this claim, and to them we must again refer.

We need not dwell upon the enormous aggregate of the property to be affected by this amendment. Each individual defendant is either the direct owner, or interested, directly or indirectly, in coal or coal lands to a very large extent, and it has owned these lands and possessed these interests, as we have seen, for long periods of years prior to the enactment of the clause in question. We need not repeat what we have already said, in regard to the harmless character of this ownership and these interests, but we can refer to the fact that some, if not all, of these defendants were invited and encouraged by the Legislature of the state of Pennsylvania to invest their funds in the coal land through which their respective railroads ran, and in the coal companies who owned and operated mines contiguous to such railroads, and that two of the corporations defendant were brought into existence by the Legislature of Pennsylvania—one of them three-quarters of a century ago and the other half a century ago—for the express purpose of developing the coal lands of the state, so that coal might be transported to the people of Pennsylvania and of other states. It is the interstate transportation of the property thus acquired and owned, that the enforcement of this act in the present proceeding seeks to enjoin and prevent.

The facts, set forth in the several answers of these defendants, abundantly show that no right of property of these defendants, in or to the coal owned by them, is so valuable or important as the right to transport it over their own roads. Every incident of this ownership and of this interest, as set out in the answers of the defendants, tends to enhance the value of this right. It must be accepted as a fact, that the coal from the mines thus owned or controlled, or in which these defendants have an interest, direct or indirect, is so situated as not to be capable of transportation, without enormous loss, by any other roads than those of the defendant owning it or interested therein. As we have before said, the exigence of the act will compel the defendants to cease mining and transporting such coal, while still retaining their ownership or interest therein, to the incalculable injury of the great populations depending upon the marketing of such coal, or, they will be compelled to surrender and divest themselves of title thereto by a compulsory sale of these coal lands and stock in coal companies. When we consider the magnitude of the sacrifice that must certainly attend such a sale, from throwing upon the market at once these properties, whose enormous aggregate value we have already referred to, it will be manifest that either alternative means a deprivation of property of enormous value by the mere command of the statute, without process of law or just compensation therefor. No refinement of argument or legal casuistry, if it were permissible in such a case, can conceal the loss directly inflicted by the enforcement of this statute, or make it anything else than a practical and substantive violation of the letter and spirit of the fifth amendment. To forbid the right to transport this commodity under the circumstances set forth in these cases,

is to deprive the larger part of the property owned or controlled by these defendants of a market, and therefore of its chief value. In such a situation, it boots little to say that the owner is not deprived of his mere title to the coal, when it has been stripped of its chief value in his hands.

Further argument is hardly needed to establish the conclusion that the necessary result of enforcing the "commodities clause" of the interstate commerce act will be to deprive the defendants of property, and likewise of their liberty as to transportation and disposition of a useful and harmless article of property—a liberty which they have always enjoyed in common with all the citizens of Pennsylvania, and under the protection of that commonwealth, and in accordance with the usages of its people and its public policies.

The gravamen of the argument on behalf of the government, as we apprehend it, may be stated as follows: Inasmuch as the same inhibition, as to depriving any person of life, liberty or property without due process of law, as is applicable by the fifth amendment to the federal government, is made applicable also to the states by the adoption of the recent fourteenth amendment, it follows that the decisions of the Supreme Court, which have exempted in certain cases the exercise of their police powers by the states from the inhibition of the fourteenth amendment, as being outside of the scope thereof, are in point, as showing that a like exemption from limitation should be accorded to the power of Congress to regulate interstate commerce. It is further argued that this power of Congress is the equivalent of the police power, as exercised by the states with reference to subjects within their jurisdiction.

The power to regulate commerce is a distinct and substantive power, granted to Congress by the Constitution, subject as we have seen to the limitations thereof. "It is complete in itself," like the other granted powers, while the police powers comprise that indefinite mass of powers reserved to the states and which inhere in all civil societies for the protection of the lives, health, morals, and public interests of their members. They have their origin in the law of necessity. There is no equivalency between them and the power to regulate commerce, which does not pertain to the other granted powers. The police powers reserved to the state must always remain indefinite in character and incapable of classification or definition, from the very variety and multiplicity of the matters with which they are concerned. As said by Mr. Justice Grier in the License Cases, 5 How. 632, 12 L. Ed. 256:

"As subjects of legislation, they are, from their very nature, of primary importance; they lie at the foundation of social existence; they are for the protection of life and liberty, and necessarily compel all laws on subjects of secondary importance, which relate only to property, convenience, or luxury, to recede, when they come in conflict or collision. * * * The exigencies of the social compact require that such laws be executed before and above all others. It cannot be supposed that the states intended, by adopting that amendment (the fourteenth), to impose restraints upon the exercise of their powers for the protection of the safety, health, or morals of the community."

See, too, Mugler v. Kansas, 123 U. S. 623, 8 Sup. Ct. 273, 31 L. Ed. 205.

When lawfully and properly enacted, their practical efficiency will not be interfered with, because they incidentally affect private property or interests. Their legitimate exercise cannot be brought within the purview of the life, liberty and property guaranties, either state or national. To do so, would tend to destroy the very foundations upon which the security of those inestimable rights of the citizen must rest. Of necessity, therefore, the courts have, from the beginning, been compelled in each case as it arose, to determine what was or was not a legitimate exercise of its police power by a state, and in doing so, to consider whether it was enacted in good faith and was calculated reasonably to accomplish any one or more of the objects within the purview of that power.

Of necessity, too, the courts must, in determining the challenged validity of any given exercise of its police powers by a state, consider the reasonableness of such exercise, in the light of the essential character of those powers, as above described, and determine whether they have "appropriate and direct connection with that protection to life, health and property which each state owes to her citizens." Patterson v. Kentucky, 97 U. S. 501, 506, 24 L. Ed. 1115. If not in direct collision with constitutional restraints, state or federal, courts will not allow indirect and incidental consequences of such exercise of the police power, to personal or property rights, to affect adversely the validity of the enactments. If, on the contrary, they are in such direct collision, or constitute a "palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge and thereby give effect to the Constitution."

If this be so, it is apparent that the argument for the unlimited character of the power conferred upon Congress to regulate commerce, is not advanced by comparing it to the police powers reserved to the states. It would still be the duty of the courts to determine whether any challenged restriction of commerce by Congress, was a reasonable exercise of the power to regulate it, or constituted "a palpable invasion of rights secured by the fundamental law." The cases in the Supreme Court, involving such a consideration of the police powers reserved to the states, have been frequent, and some of those cited by counsel for the government require a brief consideration at our hands.

It is hardly necessary to do more than refer to the full discussion of the principles to which we have above alluded, contained in the elaborate opinion delivered by Mr. Justice Harlan, for the Supreme Court, in the comparatively recent case of Mugler v. Kansas, 123 U. S. 623, 8 Sup. Ct. 273, 31 L. Ed. 205, because the court in that case went as far as it has ever gone, in recognizing the rights of the states in the exercise of their police powers, by recognizing the right of Kansas to entirely prohibit the sale or manufacture of intoxicating liquors, and thereby, as was alleged, to destroy the value of the brewery of the plaintiff in error, notwithstanding the due process provision of the fourteenth amendment. But, in order to uphold the validity of the law of Kansas in this behalf, the court deemed it necessary to show that it did not invade the rights secured by the fourteenth

amendment, because it was a reasonable exercise of the police powers of the state. In demonstrating its reasonableness in this respect, this language of Mr. Justice Grier, in the License Cases, is quoted with approval:

"The true question presented by these cases, and one which I am not disposed to evade, is whether the states have a right to prohibit the sale and consumption of an article of commerce, which they believe to be pernicious in its effects, and the cause of disease, pauperism and crime."

After stating at some length the well-known facts in regard to the pernicious character of the traffic in intoxicating drinks, Mr. Justice Harlan says:

"There is no justification for holding that the state, under the guise merely of police regulations, is here aiming to deprive the citizen of his constitutional rights; for we cannot shut out of view the fact, within the knowledge of all, that the public health, the public morals, and the public safety, may be endangered by the general use of intoxicating drinks; nor the fact established by statistics accessible to every one, that the idleness, disorder, pauperism. and crime existing in the country are, in some degree at least, traceable to this evil."

And it cannot be supposed, he says, that the states intended by the fourteenth amendment to impose restraints upon the exercise of their powers for the extirpation of such evils. While it belongs to the legislative department of the states to determine primarily what are appropriate or needful exercises of their police powers, it belongs to the courts to finally determine on the reasonableness of such exercise. Though the Kansas law in question was properly found by the court, for the reasons stated, to be a valid exercise of its police powers, Mr. Justice Harlan says that the following principles must be kept in view, "as governing the relations of the judicial and legislative departments of government with each other":

"It does not at all follow that every statute enacted ostensibly for the promotion of these ends, is to be accepted as a legitimate exertion of the police powers of the state. There are, of necessity, limits beyond which legislation cannot rightfully go. While every possible presumption is to be indulged in favor of the validity of a statute (Sinking Fund Cases, 99 U. S. 700, 718, 25 L. Ed. 496), the courts must obey the Constitution rather than the law-making department of government, and must, upon their own responsibility, determine whether, in any particular case, these limits have been passed. 'To what purpose,' it was said in Marbury v. Madison, 1 Cranch, 137, 176, 2 L. Ed. 60, 'are powers limited, and to what purpose is that limitation committed to writing, if these limits may, at any time, be passed by those intended to be restrained? The distinction between a government with limited and unlimited powers is abolished, if those limits do not confine the persons on whom they are imposed, and if acts prohibited and acts allowed are of equal obligation.' The courts are not bound by mere forms, nor are they to be misled by mere pretenses. They are at liberty—indeed, are under a solemn duty—to look at the substance of things, whenever they enter upon the inquiry whether the Legislature has transcended the limits of its authority. If, therefore, a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution."

There can hardly be a fuller recognition of the necessity of establishing the reasonableness of a given exercise of the police power,

than is exhibited in this case, and of the authority of the courts, when properly invoked, to determine the same. So in Barbier v. Connolly, 113 U. S. 27, 5 Sup. Ct. 357, 28 L. Ed. 923, a municipal ordinance, prohibiting washing and ironing in public laundries and wash houses, from 10 o'clock at night to 6 in the morning, was decided to be within the scope of the police powers conferred upon the board of governors of San Francisco by the Legislature of the state, and that the fourteenth amendment did not interfere with the exercise of the same. Here again the court was at pains to consider the particular facts of the case presented, as bearing upon the reasonableness of this exercise of police power.

The power and duty of the court to determine the reasonableness of an exercise of the police power by a state, and the constitutional limitations which may be applicable thereto, is, on the other hand, affirmatively shown in the case of Yick Wo v. Hopkins, 118 U. S. 356, 6 Sup. Ct. 1064, 30 L. Ed. 220. In that case a municipal ordinance to regulate the carrying on of public laundries within the limits of the municipality was decided not to be a legitimate exercise of the police power of the state, because it conferred upon the municipal authorities arbitrary power to give or withhold consent as to persons or places for the carrying on of the business, and thus was inimical to the letter and spirit of the fourteenth amendment. In this case, clearly the constitutional provision, as to the deprivation of personal liberty or property, was applied by the court because, in its judgment, the regulation in question was not a reasonable, and therefore not a legitimate, exercise of the police power.

Anything like a general review of the cases in which the Supreme Court has dealt with the limitations upon the exercise of the police power of the states, by the provisions of the fourteenth amendment, or by the exclusive character of the power conferred upon Congress by the commerce clause itself, would unduly prolong this opinion. We will not refrain, however, from quoting the admirable statement made on this subject, contained in the opinion delivered for the court by Mr. Justice Day, in Dobbins v. Los Angeles, 195 U. S. 223, 25 Sup. Ct. 18, 49 L. Ed. 169. That was a case in which a municipal ordinance had fixed the limits within which gas works might be erected. A subsequent ordinance was adopted, amending the former one, by which latter the territory in which the works were in course of erection, was excluded. This ordinance was held to be void as an arbitrary and discriminatory exercise of the police power of the state, which amounted to an impairment of property rights protected by the fourteenth amendment. Recognizing the doctrine, that every intendment is to be made in favor of the lawfulness of the exercise of the police powers of a state, Mr. Justice Day proceeds as follows:

"But notwithstanding this general rule of law, it is now thoroughly well settled by decisions of this court, that municipal by-laws and ordinances, and even legislative enactments undertaking to regulate useful business enterprises, are subject to investigation in the courts with a view to determining whether the law or ordinance is a lawful exercise of the police power, or whether under the guise of enforcing police regulations there has been an unwarranted and arbitrary interference with the constitutional rights to

carry on a lawful business, to make contracts, or to use and enjoy property. In Lawton v. Steele, 152 U. S. 133, 137, 14 Sup. Ct. 499, 501, 38 L. Ed. 385, Mr. Justice Brown, speaking for the court, said upon this subject: 'To justify the state in thus interposing its authority in behalf of the public, it must appear, first, that the interest of the public generally, as distinguished from those of a particular class, require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals. The Legislature may not, under the guise of protecting the public interests, arbitrarily interfere with private business or impose unusual and unnecessary restrictions upon lawful occupations. In other words, its determination as to what is a proper exercise of its police powers, is not final or conclusive, but is subject to the supervision of the courts.' And again, in Holden v. Hardy, 169 U. S. 366, 398, 18 Sup. Ct. 383, 390, 42 L. Ed. 780, the same justice, again speaking for the court, said: 'The question in each case is, whether the Legislature has adopted the statute in exercise of a reasonable discretion, or whether its action be a mere excuse for an unjust discrimination, or the oppression or spoliation of a particular class.' "

The learned justice then quotes with approval from the opinion of the Supreme Court of California, in the case of In re Smith (decided May 31, 1904) 143 Cal. 368, 77 Pac. 180, the following language:

"But, running current with this principle [that the courts will not interfere with state laws within the scope of their legislative power], and to be read with it, is one of equal importance, namely, that when the police power is exerted to regulate a useful business or occupation, the Legislature is not the exclusive judge as to what is a reasonable and just restraint upon the constitutional right of the citizen to pursue any trade, business or vocation, which in itself is recognized as innocent and useful to the community. It is always a judicial question if any particular regulation of such right is a valid exercise of police power, though the power of the courts to declare such regulation invalid will be exercised with the utmost caution, and only where it is clear that the ordinance or law declared void passes the limits of the police powers, and infringes upon rights guaranteed by the Constitution."

These cases, in regard to the police power of the states and the restraints imposed thereon by the fourteenth amendment, are exceedingly pertinent, as that power is at least as broad as the power of Congress to regulate commerce.

The cases cited by the government, from Gibbons v. Ogden down to the present time, which recognize the doctrine of that case, that the power granted by the commerce clause of the Constitution is exclusive of any like power remaining in the states, have manifestly no bearing upon the question we are now considering, viz., whether the power of Congress under the commerce clause is unlimited, as contended for by counsel for the government, or is subject to those "restrictions on the exercise of the power" which Chief Justice Marshall says "are found in the Constitution of the United States." No further reference need be made to them, except to point out that, by the recognition of the exclusiveness of this power, a further and distinct limitation is placed upon the exercise by the states of their police powers.

But it is further said, in the argument for the government, that the unlimited power of Congress over interstate commerce is illustrated in the embargo cases, and the question, whether Congress could prohibit all commercial intercourse between the states, and thus destroy what it was only empowered to regulate, is answered by saying that the question supposes an impossibilty, and the authority of Chief Justice

Marshall is again invoked for the proposition which they formulate, as follows:

"That the. policy of Congress, in the enactment of a law, is not within the judicial cognizance, that though all power granted to any department was liable to be abused, the remedy must be found at the ballot box."

We have·already quoted Chief Justice Marshall's precise language in this respect, and have shown that he was speaking of the abuse of the power, as it existed under the grant of the Constitution, subject to those limitations inherent in its nature, or prescribed by the Constitution itself, and that·if abused within its permitted bounds, such abuse could only be corrected by the people at the polls.

We need not enlarge· upon the argument derived from the acquiescence in the embargo and nonintercourse acts. It is true, that both the power conferred to regulate commerce with foreign nations and with the Indian tribes, and the power to regulate the same among the states, are conferred in the same clause and by the same terms, and while the one is as complete as the other, each is complete with reference to the .peculiar nature of its own subject-matter. The power to prohibit foreign commerce, in part or in whole, may in one aspect of it be part of the war power, and in another result from the inherent and necessary power recognized by international law in an independent nation, to control its intercourse with foreign nations to any extent, by treaty or otherwise, even to the extent of prohibiting all intercourse therewith. We.hazard nothing in saying that the power to regulate commerce among the states could not be exercised to this extreme limit. The fundamental principles lying at the foundation of the Union of states, and the purposes for which such Union was formed, as well as the whole scheme of our constitutional government, insure the perpetuity of the·freedom of commercial intercourse between the states, subject only to.the legitimate control of Congress under the power to regulate the same. No case yet decided by the Supreme Court asserts the unlimited power of Congress, under the commerce clause, that is here contended for. On the contrary, the court has frequently asserted, in varying language, that the power to regulate commerce is subject to all the limitations imposed by the Constitution, and among them, that of the fifth amendment. The language of the court in Monongahela Nav. Co. v. U. S., 148 U. S. 336, 13 Sup. Ct. 630 (37 L. Ed. 463) expresses the position assumed in all the cases touching this matter. It is as follows:

"Like the other powers granted to Congress by the Constitution, the power to regulate commerce is subject to all the limitations imposed by such instrument, and among them is that of the fifth amendment we have heretofore quoted."

All the argumentation of counsel for the government, in support of the validity of this legislation, would be equally applicable to any assertion of the power of Congress to regulate commerce, however arbitrary it might be, or to whatever extent, by prohibition or otherwise, it might affect the liberty or property of the citizen. If, as the Attorney General contends, the power of Congress to prohibit interstate commerce is as absolute as that exercised over foreign commerce in

the embargo and nonintercourse acts, Congress may, for any reason or no reason, prohibit, in whole or in part, the interstate transportation of necessary and harmless commodities and restrain the liberty of the citizens of the several states, or of certain classes of them, from engaging in interstate commerce therein. If the propositions laid down by the Attorney General are sound, it is hard to conceive upon what ground legislation could be challenged which arbitrarily prohibited farmers from carrying their own corn, by their own teams, to market across the boundary line between their own and another state. Such a power would be a mockery of the purposes for which the Constitution was formed, and destroy that freedom of interstate trade which it was intended to secure.

Counsel cite the so-called "Lottery Case," 188 U. S. 321, 23 Sup. Ct. 321, 47 L. Ed. 492, in support of their extreme contention, but even a cursory reading will show how far short of answering this purpose was the judgment in that case. The court decided that, though the power to regulate lotteries, and to permit or prohibit the sale of lottery tickets, was exclusively within the jurisdiction of the police power reserved to the states, yet lottery tickets, in view of their essential character as written certificates, were articles of value in the hands of the holder thereof, were the subjects of traffic, and therefore of commerce, and the regulation of the carriage of such tickets from state to state was a legitimate regulation of commerce among the states. The court, then, in addressing itself to the question, whether Congress, under the power of regulation, could prohibit the carriage of such articles entirely from state to state, in the exhaustive and erudite opinion written by Mr. Justice Harlan, said (the italics being ours):

"In determining whether regulation may not under *some* circumstances properly take the form or have the effect of prohibition, the nature of the interstate traffic which it was sought by the Act of May 2, 1895, to suppress cannot be overlooked. When enacting that statute Congress no doubt shared the views upon the subject of lotteries heretofore expressed by this court. In Phalen v. Virginia, 8 How. 163, 168, 12 L. Ed. 1030, after observing that the suppression of nuisances injurious to public health or morality is among the most important duties of government, this court said: 'Experience has shown that the common forms of gambling are comparatively innocuous when placed in contrast with the widespread pestilence of lotteries. The former are confined to a few persons and places, but the latter infests the whole community; it enters every dwelling; it reaches every class; it preys upon the hard earnings of the poor; it plunders the ignorant and simple.' In other cases we have adjudged that authority given by legislative enactment to carry on a lottery, although based upon a consideration in money, was not protected by the contract clause of the Constitution; *this, for the reason that no state may bargain away its power to protect the public morals,* nor excuse its failure to perform a public duty by saying that it had agreed, by legislative enactment, not to do so. Stone v. Mississippi, 101 U. S. 814, 25 L. Ed. 1079; Douglas v. Kentucky, 168 U. S. 488, 18 Sup. Ct. 199, 42 L. Ed. 553.

"If a state, when considering legislation for the suppression of lotteries within its own limits, may properly take into view the evils that inhere in the raising of money, in that mode, why may not Congress, invested with the power to regulate commerce among the several states, provide that such commerce shall not be polluted by the carrying of lottery tickets from one state to another? In this connection it must not be forgotten that the power of Congress to regulate commerce among the states is plenary, is complete in

itself, and is subject to no limitations except such as may be found in the Constitution. What provision in that instrument can be regarded as limiting the exercise of the power granted? What clause can be cited which, in any degree, countenances the suggestion that one may, of right, carry or cause to be carried from one state to another that which will harm the public morals? We cannot think of any clause of that instrument that could possibly be invoked by those who assert their right to send lottery tickets from state to state, except the one providing that no person shall be deprived of his liberty without due process of law. We have said that the liberty protected by the Constitution embraces the right to be free in the enjoyment of one's faculties; 'to be free to use them in all lawful ways; to live and work where he will; to earn his livelihood by any lawful calling; to pursue any livelihood or avocation, and for that purpose to enter into all contracts that may be proper.' Allgeyer v. Louisiana, 165 U. S. 578, 589, 17 Sup. Ct. 427, 41 L. Ed. 832. But surely it will not be said to be a part of any one's liberty, as recognized by the supreme law of the land, that he shall be allowed to introduce into commerce among the states an element that will be confessedly injurious to the public morals. * * *

"As a state may, for the purpose of guarding the morals of its own people, forbid all sales of lottery tickets within its limits, so Congress, *for the purpose of guarding the people of the United States against the 'widespread pestilence of lotteries'* and to protect the commerce which concerns all the states, may prohibit the carrying of lottery tickets from one state to another. In legislating upon the subject of the traffic in lottery tickets, as carried on through interstate commerce, Congress only supplemented the action of those states—perhaps all of them—which, for the protection of the public morals, prohibit the drawing of lotteries, as well as the sale or circulation of lottery tickets, within their respective limits. It said, in effect, that it would not permit the declared policy of the states, which sought to protect their people against the mischiefs of the lottery business, to be overthrown or disregarded by the agency of interstate commerce."

Here, as in the cases in relation to the exercise by the states of their police powers, in view of the "due process" provision of the fourteenth amendment, the Supreme Court has felt itself compelled to consider the reasonableness of this particular exercise of the power of Congress to regulate interstate commerce, in view of the nature of that power and of the "due process" clause of the fifth amendment. If this power of regulation is as absolute as contended for by the Government, and acknowledges none of the limitations prescribed by the Constitution, of which Chief Justice Marshall speaks in defining that power, the elaborate and convincing argument of the opinion in the Lottery Case, to show that interstate commerce should not be made available for the promotion of a pestilential form of gambling, destructive alike of the morals and material interests of the people, was wholly unnecessary. It would have been sufficient to say that the power was absolute and free from any limitation except the will of Congress, and that the reasonableness of its exercise was not a matter for judicial discussion or determination.

This harmful character of lotteries was judicially recognized as far back as 1833, by the Court of Errors and Appeals of Delaware (Vannini v. Paine, 1 Har. 65), in a case from which the following language is quoted and approved by the Supreme Court, in Patterson v. Kentucky, 97 U. S. 508, 24 L. Ed. 1115. The Delaware court said:

"At the time Yates and McIntyre made contracts for the lottery privileges set forth in the bill, we had in force an act of assembly prohibiting lotteries, the preamble of which declares that they are pernicious and destructive to

frugality and industry, and introductive of idleness and immorality, and against the common good and general welfare. It therefore cannot be admitted that the plaintiffs have a right to use an invention for drawing lotteries in this state, merely because they have a patent for it under the United States. A person might, with as much propriety, claim a right to commit murder with an instrument, because he held a patent for it as a new and useful invention."

That this was the particular ground upon which the decision in the Lottery Case, was based, is emphasized by the reference made in the opinion of the court to Act Cong. May 29, 1884, c. 60, 23 Stat. 31 (U. S. Comp. St. 1901, p. 299), prohibiting railroad companies or steam or sailing vessels from receiving, for interstate transportation, any live stock affected with contagious or infectious diseases, and especially the disease known as pleuro-pneumonia. This act was referred to in the case of Reid v. State of Colorado, 187 U. S. 137, 23 Sup. Ct. 92, 47 L. Ed. 108, in which it was decided that the act of that state, forbidding the introduction of cattle with infectious or contagious diseases, was constitutional, the court saying in its opinion:

"It is said that the defendant has a right under the Constitution of the United States to ship live stock from one state to another state. This will be conceded on all hands. But the defendant is not given, by that instrument, the right to introduce into a state, against its will, live stock affected by a contagious, infectious, or communicable disease."

It should not escape observation and comment, that the traffic in lottery tickets, as prohibited by Congress, was regarded as malum in se. It was pernicious and immoral in those who received those tickets in interstate transportation, as well as in those who issued and consigned them. The extirpation of such a traffic was, as said by Mr. Justice Harlan, a legitimate exercise, both of the police power of the state and of the like power of Congress in aid thereof under the commerce clause. Nothing like this is true of the case before us. The traffic sought to be here prohibited was admittedly, up to the time of the enactment in question, lawful, moral and innocent at both ends thereof. The one who bought the coal from the owner who delivered the same over his own road, was innocently enjoying a liberty of buying where he could buy to his own advantage, a liberty characteristic of healthy business activities everywhere. No reproach attaches or has ever attached to such conduct; indeed, the commodities clause itself refrains from denouncing it as a crime. It will be seen from the case just cited, that the reasonableness of a regulation of commerce, which amounts to a prohibition of any of the commodities which may form the subject-matter of interstate commerce, must be inquired into by the courts when the validity thereof is challenged, and it is also seen upon what grounds such validity can be sustained.

The practical wisdom of such an exercise of the judicial function is vindicated by its necessity. In no other way can the exercise of this vast and complete power conferred on Congress by the Constitution, be kept within the limitations imposed by that instrument itself, or its salutary efficiency be maintained.

The case of United States v. 43 Gallons of Whiskey, 93 U. S. 188, 23 L. Ed. 846, cited by the government, might have been placed upon

the same ground. But the court thought it necessary to place it upon the peculiar situation of the Indians, as quasi wards of the government, and upon the treaty-making power which was exercised by a stipulation in a treaty with an Indian tribe, that, within the territory thereby ceded, the laws of the United States, then or thereafter enacted, prohibiting the introduction of spirituous liquors in the Indian country, shall be in full force and effect.

We do not think the cases referred to under the anti-trust act (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]), such as United States v. Joint Traffic Association, 171 U. S. 571, 19 Sup. Ct. 25, 43 L. Ed. 259, and Addystone Pipe Co. v. United States, 175 U. S. 211, 20 Sup. Ct. 96, 44 L. Ed. 136, and United States v. Trans-Missouri Freight Association, 166 U. S. 290, 17 Sup. Ct. 540, 41 L. Ed. 1007, are at all applicable to the question here at issue. They deal with the illegality of contracts or combinations made in violation of the act of Congress, sometimes called the "Anti-Trust Law," and it is decided that that act refers to all contracts of every description, whether reasonable or unreasonable, and that courts have no right to discriminate in that regard, but, under the express language of the act, any contract in restraint of trade was within its purview. But it is well to refer for a moment to the grounds upon which the decisions in these cases are placed. In United States v. Trans-Missouri Freight Association, supra, after deciding that the statute was intended to apply to common carriers by railroad, the court, through Mr. Justice Peckham, says:

"The next question to be discussed is as to what is the true construction of the statute, assuming that it applies to common carriers by railroad? What is the meaning of the language as used in the statute, and that 'every contract, combination in the form of trust, or otherwise, or conspiracy in restraint of trade or commerce among the several states, or with foreign nations, is hereby declared to be illegal'? Is it confined to a contract or combination which is only in unreasonable restraint of trade or commerce, or does it include, what the language of the act plainly and in terms covers, all contracts of that nature?"

In reply to the contention that the statute should be so construed as to interdict only those contracts which were in unreasonable restraint of trade, the court replied, that its express language covered all contracts in restraint of trade, and that it was not permitted to the court to read into the statute a qualifying word, which made it apply to less than all such contracts. The plain intention of the law was to protect the freedom of trade, and it thus carried out what must be admitted to be the underlying purpose of the commerce clause of the Constitution. No question was raised as to the right of Congress to thus declare unlawful all contracts in restraint of trade. In a certain sense, the statute is declaratory of the common law, by which for centuries, such contracts have been denounced as illegal.

United States v. Joint Traffic Association, and Addystone Pipe Co. v. United States, supra, were decided upon the authority of the case just quoted from. They concern the enforcement of the same provisions of the anti-trust law, and declare that private agreements between persons or corporations, tending directly, and not indirectly or incidental-

ly, to restrain trade among the states, were unlawful. It is no longer contended that the interdiction of such contracts is not a valid exercise of the power to regulate interstate commerce. The decisions in these cases, and others of the same class, plainly have no bearing upon the questions we have here to consider.

It is unnecessary to discuss in detail the numerous decisions of the Supreme Court, which recognize, directly or impliedly, the duty of the court to inquire into and determine the reasonableness of legislation, purporting to be a regulation of commerce under the commerce clause of the Constitution, as to its being properly such, or as to whether it contravenes the inhibition of the fifth amendment, by depriving any person of life, liberty or property without due process of law. Among the cases relied upon by the Attorney General, in support of the "commodities clause," is the case of New Haven Railroad Co. v. Interstate Commerce Commission, 200 U. S. 361, 26 Sup. Ct. 272, 50 L. Ed. 515. A brief review of the facts in that case, and its ratio decidendi, we think will show that, far from supporting the contention made by the learned Attorney General, it distinctly fails to do so. The charge was that the Chesapeake & Ohio Railroad was engaged in the carriage of coal, as interstate traffic, between a district of West Virginia and Newport News, Va., for delivery thence to the New Haven, in Connecticut, and that the traffic was being moved at less than the published rates, and in such a way as to produce a discrimination in favor of the New Haven road, as against others, in violation of the act to regulate commerce, and the amendments thereto. The Chesapeake & Ohio had made a verbal agreement with the New Haven to sell to that road 60,000 tons of coal, to be carried from the Kanawha district to Newport News, and thence by water to Connecticut, for delivery to the buyer at $2.75 per ton, and that a considerable portion had already been delivered, and the remainder was in process of delivery. It was charged that, in order to comply with this contract, the Chesapeake & Ohio bought the coal at the mines, and that the price paid and the cost of transportation from Newport News to Connecticut would aggregate $2.47 per ton, thus leaving to the Chesapeake & Ohio only about 28 cents a ton for carrying the coal to Newport News, whereas, the published tariff for like carriage from the same district was $1.45 per ton. The petition alleged that the Chesapeake & Ohio asserted that, although the total price which it received for the coal covered by the verbal agreement, was less than the total outlay in delivering the coal, including its published rates, such fact did not amount to a departure from the published rates, and was not a discrimination, for two reasons: First, because, if such difference existed, it was a loss suffered by the Chesapeake & Ohio, not from taking less than its published rate, but because it had received less as a purchaser than the coal had cost; second, that, even if it had not the lawful right thus to impute the payment of the price of the coal, the Chesapeake & Ohio had, in fact, received much more for the coal than the price in money agreed on, because, at the time of the verbal agreement to sell, the New Haven had a claim of $100,000 against the Chesapeake & Ohio, which was to be extinguished by the completion

of the delivery of the coal, and in this way caused the price thereof largely to exceed the cost of the coal to the Chesapeake & Ohio, including its published rates. With his usual perspicuity, Mr. Justice White brushed aside the sophistry of the contention, that by purchasing the coal at the mines the Chesapeake & Ohio could avoid the requirement of the act, that it should not carry coal for less than its published rates; and held that, where the difference between the price paid for the coal at the mines and that for which it was sold was not sufficient to cover the published freight rates for carrying the same, the charging of the full rates for the freight, and entering up in their books the difference between those rates and the prices at which the coal was to be delivered in New Haven, as the price actually received, was a mere device in fraud of the law, and was a palpable violation thereof. Accordingly, it was decreed that the contracts made by the Chesapeake & Ohio with the New Haven were contrary to public policy, and void, because in conflict with the prohibitions of the act to regulate commerce, and the Chesapeake & Ohio was perpetually enjoined from taking less than the rates fixed in its published tariff, by means of dealing in the purchase and sale of coal.

The question, as put by the learned justice, is this:

"Has a carrier engaged in interstate commerce the power to contract to sell, and transport in completion of the contract, the commodity sold, when the price stipulated in the contract does not pay the cost of purchase, the cost of delivery, and the published freight rates?"

Further on, it is said:

"Now in view of the positive command of the second section of the act, that no departure from the published rate shall be made 'directly or indirectly,' how can it in reason be held that a carrier may take itself from out the statute in every case, by simply electing to be a dealer, and transport a commodity in that character?"

The opinion is a most interesting one, and completely demonstrates the futility of any attempt to avoid the inhibitions of the act against discriminations in freight rates by one who deals in or owns the coal to be transported, if such attempt, like any other violation of the law, is prosecuted in the courts having jurisdiction of the same. It is true that, in the opinion, the duality of ownership and transportation of commodities is animadverted upon as presenting a temptation to avoid thereby the requirements of the act. But conditions or situations may not be destroyed by the mere fiat of an act of Congress, because they may create temptations for violating the law. It was one thing to say, as was said by Mr. Justice White in this case, that it did not matter, so far as it affected the power to enforce the requirements of the interstate commerce act in the case before the court, that its enforcement might make it difficult or impossible for a railroad company to transport its own coal in interstate commerce, but quite a different thing for Congress to say, in the first instance, that such coal could not be so carried at all. In one case, the regrettable inconvenience to the public, and injury to a private property right merely incidental to the enforcement of a valid regulation of commerce, were not allowed to obstruct the same, while, on the other hand—the case we are

now considering—these regrettable results are sought to be brought about directly by legislative enactment, independently of any other asserted regulation of commerce. It is perfectly clear that in the application of this well-settled doctrine as to the incidental loss or injury that may result from the enforcement of valid laws, Mr. Justice White is not to be taken as, even by way of obiter dictum, sanctioning the validity of the act here in question. When he speaks of "proper rules and regulations for the segregation of the business of producing, selling and transporting, as presented in the Haddock and Coxe Cases (before the Interstate Commerce Commission), as not being confiscatory," the meaning is evident that, in the business of carrying its own coal by a railroad carrier, there should be a "segregation" of the same into such departments as would make plain in any case, whether a fraud upon the law against discrimination was being practiced. The course so pointed out would have fully regulated commerce in anthracite coal, without at all restraining it or depriving the carriers in question of the full enjoyment of their corporate powers, and of the properties lawfully and innocently acquired thereunder. With this remedy for the supposed evil in the hands of Congress, the unreasonableness of the statute under consideration as a regulation of commerce, becomes still more apparent. It extirpates and destroys an entirely lawful business, in order to stamp out the evils which may be practiced in its conduct.

Applying the philosophy of this case to those before us, it is obvious that, instead of a competent and efficient regulation of commerce, directly dealing with the evil of the situation, by explicitly forbidding and penalizing all such discriminations in freight rates as were possible of commission under guise of the ownership of the commodity carried, the enactment in question has excluded from interstate commerce all commodities owned by the carrier, whether their transportation be carried on in conformity with the legal requirements against discrimination, or not. Such an exclusion can only be justified by the assumption that a carrier, who transports his own coal, as well as that of others, must discriminate. It could hardly be more unreasonable to forbid the burning of coal on the locomotives, and compel a resort to wood for fuel, because the carriage and distribution of such coal might furnish the opportunity for the attempt to discriminate in freight rates, as to the coal necessarily remaining after the preparation of coal for their own steam purposes.

It has long been settled that, because the products of domestic enterprises in agriculture, manufactures, or the arts, may ultimately become the subjects of interstate or foreign commerce, the control of the means or the encouragements by which they are fostered and protected, are not on that account within the regulative power of Congress. Veazie v. Moor, 14 How. 573, 14 L. Ed. 545; Kidd v. Pearson, 128 U. S. 1, 9 Sup. Ct. 6, 32 L. Ed. 346. A fortiori, that power cannot be extended, in the guise of regulation, to the destruction of property interests which only indirectly affect interstate commerce, and this, we think, is true independently of any consideration of the effect of such a regulation as an arbitrary spoliation of property rights, within the protection of the fifth amendment.

Counsel for the government have dwelt much upon the case of Union Bridge Co. v. United States, 204 U. S. 364, 27 Sup. Ct. 367, 51 L. Ed. 523, to show the unlimited character of the power to regulate. commerce. The complete control of Congress under this power, over the navigable waters of the United States, as highways of interstate or foreign commerce, for the purpose of keeping them clear and unobstructed for navigation, has long been recognized. Any physical obstruction to or interference with their free navigation, may undoubtedly be dealt with as such by Congress. These waters are public highways of the nation, and no one can be so permitted to encroach upon them, as to deprive Congress of the right and power to abate the public nuisance thereby created. No one can acquire rights as to such navigable waters, in derogation of the public right to navigate the same. This was the doctrine of the Union Bridge Co. Case. Its bridge, though permitted to be built at a time when it did not interfere with the navigation of the Allegheny river, afterwards, owing to the development of commerce, became an obstruction to such navigation, and as such, was properly required to be so altered in height as to prevent its being an obstruction. The pecuniary loss resulting thereby to the owners, was not in any proper sense a taking of private property for public use, without compensation, or a deprivation thereof without due process of law under the fifth amendment.

Arguments from analogy are always to be guardedly used, as they are often misleading. The argument is seriously made that, as Congress may remove a physical obstruction to navigation, like a rock or a bridge, it may call anything it chooses an obstruction, not to navigation, but, to commerce generally, and require its removal. It hardly needs to be pointed out that the analogy is unsound and fanciful. It would have us conclude that, because Congress can declare a rock or a bridge an obstruction to navigation, and require its removal, it may also declare the otherwise lawful carriage of their owner's harmless commodities by the boats navigating the river, to be an obstruction to commerce, and so forbid it. If, indeed, the latter may be done, there is no logical nexus between the two. The bridge may be removed as a patent physical obstruction to navigation, and so, pro tanto, an obstruction to commerce, but it could hardly be contended that Congress could, by declaring a house situated a mile back from a river an "obstruction" to its navigation, escape the inhibitions of the fifth amendment. Such an assertion of power would clearly come within the scope of the judgment in the case of Monongahela Navigation Co. v. U. S., supra. A fortiori, Congress cannot, by merely calling a theretofore lawful and harmless social or business situation an obstruction to interstate commerce, escape the inhibitions of the said amendment, in decreeing its destruction.

It is clearly a judicial question, not to be avoided, whether this enactment, known as the "commodities clause," in view of the character of the discriminations made by it, as between owners of property, and of the inhibitions of the fifth amendment to the Constitution, is a reasonable exercise of the power conferred upon Congress to regulate interstate commerce. Passing its discriminatory features, we con-

fine ourselves to the consideration, whether the enactment in question is violative of any right of the defendants, within the protection of the fifth amendment. The facts appearing in these several cases, in regard to the history of the character and extent of the ownership and interests in coal and coal lands of these defendants, that will be injuriously affected by the enforcement of this law, render it impossible to say that there has not been a deprivation, as to each of them, of its liberty and its property, within the meaning of that clause of the fifth amendment which forbids that any person shall be deprived of life, liberty or property without due process of law.

It is to be observed in the first place, that the act is in a certain sense retroactive. It applies to or affects property lawfully acquired long prior to the date of its enactment, and lawfully and innocently enjoyed under the sanction of the laws of Pennsylvania during long periods of years prior thereto, and is not confined to the dual ownership of transportation and property acquired after the passage of the act. In forbidding the defendants to transport in interstate commerce the products of the mines owned by them, or in which they are directly or indirectly interested, it cannot be doubted, from the facts stated in the records before us, that a most important, if not the most important, property right attaching thereto is stripped from these defendants. As we have before said, it is to no purpose to assert that they are not, by force of this enactment, deprived of the legal title to these various properties. Courts "are at liberty—indeed are under a solemn duty—to look at the substance of things, whenever they enter upon the inquiry whether the Legislature has transcended the limits of its authority." It is perfectly clear, from the conditions, as stated, under which these coal lands, mines, and interests in coal companies are held by these defendants, that the deprivation of the right to carry their products in interstate commerce is a deprivation of the most valuable property right attaching thereto. It is urged by the government, however, that the defendants may divest themselves of these properties, by selling the same. Such a suggestion seems only to emphasize the arbitrary and despotic character of the legislative act. The thing commanded bears no relation to that which is within the power of Congress to prescribe.

The regulation must be within the restrictions of the Constitution, reasonably construed in application thereto. In determining this question of reasonableness, the carefully considered expert opinion of the Interstate Commerce Commission is entitled to great weight. In distinguishing the case of Grain Rates of Chicago Great Western Ry. Co., 7 Interst. Com. R. 33, from those of Haddock v. D., L. & W. R. R. Co., 3 Interst. Com. R. 302, and Coxe Bros. & Co. v. Lehigh Valley R. R. Co., Id. 460, the learned Commission said:

"Those cases are in no respect similar to this. In both, the common carrier was also the owner of extensive coal fields, and indeed it had become a common carrier largely for the purpose of transporting the product of those mines to market. This state of things existed before the passage of the act, and had no reference to the act. Unless the carrier was permitted to transport its coal, the result would be in effect the confiscation of its property, and to order it to charge itself with a particular rate would merely re-

sult in a matter of book-keeping. Under these circumstances, it was held that the only remedy was to inquire whether the rate charged the complainant was a reasonable one."

Even if wrong in their conclusion, as intimated by Mr. Justice White, that an enforcement of the prohibition against discrimination in rates, under proper rules and regulations for the separation of the business of producing, selling and transporting into appropriate departments, would have amounted to an interdiction on the carrier as to carrying his own coal, and have been, therefore, confiscatory in its results, this does not detract from the force of the judgment expressed by the Commission, that if the operation of the act were such as to interdict the interstate carrying of coal by the railroad carriers owning or interested in the same, it would be practically a confiscation of its property. Yet, this is just what the "commodities clause," not indirectly, but directly, does. As said by one of the counsel who argued these cases at the bar:

"To prevent favoritism and discrimination, it is not necessary to deprive the carrier of its right to transport its own commodities, to render useless hundreds of millions of dollars of its improvements, or practically to destroy the value of property by forbidding its transportation."

The provision, that no person shall be deprived of liberty or property without due process of law, would, indeed, be shorn of its vitality if the contention of the government in the premises can be sustained. If, without regard to the exigence of the fifth amendment, we merely compare the consequences of this so-called regulation of commerce to the property and property rights of these defendants, with what we are told is the end to be achieved by this so-called regulation of interstate commerce, the utter unreasonableness of the said regulation will still more clearly appear. A property right, of almost incalculable value, which these defendants have hitherto innocently enjoyed in common with the citizens of Pennsylvania and of all the other states, is stricken down for the alleged purpose of preventing discrimination by common carriers, as owners and carriers of such property, as against others who may lawfully require their services. It hardly needs pointing out, how enormous the disparity between the value and importance of the end accomplished and the cost of the means employed for the accomplishment; and this, too, when any such discrimination, if it exists, can be remedied by regulations bearing a direct relation thereto. But, to further make the disparity between the means and the end to be accomplished more apparent, it is not because such discriminations are practiced, but because they possibly may be practiced.

From every point of view from which we have been able to approach the question, the unreasonableness and consequent invalidity of this so-called "commodities clause" is apparent. It invades the rights of the state, by striking down the liberty hitherto innocently enjoyed by its citizens under the laws and usages of the commonwealth, to engage in interstate commerce to the fullest extent, as to all harmless articles, whether owned or not owned by the carrier, and deprives of their property these defendants, contrary to the letter and spirit of

the fifth amendment to the Constitution. If the enactment in question be warranted by the commerce clause of the Constitution, it is hard to see what bounds may be set to the exercise of that power. It will indeed be an open door, through which the forces of a centralization hitherto unknown may enter at will, to the overthrow of that just balance between federal and state power, for which the makers of the Constitution so wisely provided, as an essential to the preservation of our dual form of government.

We confine ourselves to the concrete facts presented by the pleadings in these cases, and express no opinion as to cases where property has been acquired by the carriers subsequent to the passage of the act. For the reasons stated, therefore, these bills in equity are dismissed, and the petitions for writs of mandamus on the law side of this court are denied.

DALLAS, Circuit Judge (concurring). I fully concur in the foregoing opinion, and the little now to be added is intended merely to accentuate my acceptance of it.

It was held in the Lottery Case, 188 U. S. 321, 23 Sup. Ct. 321, 47 L. Ed. 492, that the power of Congress to regulate commerce among the states is plenary, and is subject only to such limitations as the Constitution imposes upon its exercise; but it was not held that the power committed to Congress to prescribe the rules by which interstate commerce is to be governed authorizes the interdiction of its pursuit by any person or persons, natural or artificial, without regard to the character of the traffic sought to be proscribed. It was decided, it is true, that the prohibition of the carriage of lottery tickets is an "appropriate mode for the regulation of that particular kind of commerce"; but it was not decided that prohibition, apart and distinct from regulation, may be ordained, or that as a mode for regulation it would universally, or even generally, be appropriate. On the contrary, it was said that:

"In determining whether regulation may not under some circumstances properly take the form or have the effect of prohibition, the nature of the interstate traffic * * * cannot be overlooked."

Where it is "a kind of traffic which no one can be entitled to pursue as of right," its pursuit by any one may be prevented. This the Lottery Case has established; but that a common carrier may be forbidden to transport from one state to another any article or commodity, however useful and inoffensive, which Congress may choose, no matter with what motive, to exclude from such transportation, neither the Lottery Case nor any other has determined.

The prohibitory intent of the piece of legislation under consideration is too plain for disavowal, and the suggestion that what it prohibits is not interstate commerce, but interstate transportation by a railroad company of commodities which it has produced, etc., is delusive. The question is not whether the carriage from state to state of coal produced by the carrier is interstate commerce, for of course it is, but whether, being a kind of commerce which is not inimical to safety, health, or morals, and which, therefore, any one is entitled to pur-

sue "as of right," Congress may restrict a railroad company's inter-
state transportation of coal to coal not mined or owned by it and in
which it has no interest. Any such restriction, whatever it may be
called, in its nature and effect is discriminative prohibition; and that
the restrictive provision now in question was enacted, not actually for
the regulation of interstate commerce, but really to coerce the con-
formity of intrastate business with a "policy" approved by Congress,
seems practically to be admitted, and could not, with candor, be
denied.

"While every possible presumption is to be indulged in favor of
the validity of a statute, the courts must obey the Constitution rather
than the lawmaking department of government," and they have been
charged with no duty more exalted or imperative than that of resolute-
ly resisting the assumption by that department of any power not dele-
gated to it by the Constitution, let the pretext or ostensible object be
what it may. No court has authority, under the guise of interpreta-
tion, to change the Constitution for the purpose of meeting a supposed
requirement of present conditions, and the covert tendency of any
usurpation of such authority would inevitably be to transform the
government of enumerated powers which the Constitution establish-
ed into a government with all power vested in its legislative and ex-
ecutive branches.

But there are rights not derived from the Constitution, though they
may be secured by it, which in any free government must be conceded
to be beyond invasion by any of its departments (Loan Association v.
Topeka, 87 U. S. 662, 22 L. Ed. 455), and the inherent right of the
states to unrestricted innoxious commercial intercourse never has been
relinquished nor made dependent upon the sufferance of the body to
which its regulation was confided, not for its suppression in whole
or in part, but to foster its benefits and preclude its obstruction. The
right itself was "retained by the people," and by no subterfuge can
any of the people, whether incorporate or not, be deprived of it.
Moreover, the states, subject only to the powers delegated to the Unit-
ed States by the Constitution or prohibited by it to the states, have sev-
erally the right, within their respective geographical limits, to the ad-
ministration of their own law for the maintenance and defense of
life, liberty, and property; and consequently Congress, unless in aid
of the unfeigned exercise of a power possessed by it, has no authority
whatever to divest, limit, or impair any property right which com-
petent state law recognizes and protects. Yet we are confronted in
these cases with an attempt to subvert by congressional edict the right
to use and enjoy property of the utmost value, which was acquired
and has long been held under state law of unquestionable validity,
and to withhold from the people of many of the states a commodity
which has aptly been characterized as "a prime necessity of life and
an essential of civilization." Such legislation is incompatible with
free government (Loan Ass'n v. Topeka, supra), and, in my opinion,
it is simply impossible to find support for it in a grant of power to
regulate commerce, coupled with a mandate that private property
shall not be taken for public use without just compensation, and that

no person shall be deprived of liberty or property without due process of law. The inclination sometimes manifested to centralize power in the general government results in great measure, no doubt, from the apparent expediency of committing to it the correction of ills which it is supposed that the states cannot so readily repress; but the achievement of no presently desired end, however salutary, can justify the infraction of our fundamental law, or warrant its perversion by insidious construction. The Constitution of the United States is a written instrument, not a progressive development, and the often quoted epigram that "constitutions are not made but grow," should not apply to it.

BUFFINGTON, Circuit Judge (dissenting). These cases involve the constitutionality of the fifth paragraph of the first section of an act of Congress, approved June 29, 1906, which provides:

"From and after May 1, 1908, it shall be unlawful for any railroad company to transport from any state, territory, or the District of Columbia, to any other state, territory, or the District of Columbia, or to any foreign country, any article or commodity, other than timber and the manufactured products thereof, manufactured, mined, or produced by it, or under its authority, or which it may own in whole, or in part, or in which it may have any interest, direct or indirect, except such articles or commodities as may be necessary and intended for its use in the conduct of its business as a common carrier."

In Brown v. Walker (C. C.) 70 Fed. 46, where the constitutionality of the immunity clause of the interstate commerce act, already held unconstitutional in another jurisdiction (United States v. James [C. C.] 60 Fed. 257, 26 L. R. A. 418), came before Judge Acheson and myself, the court said:

"When a statute has been passed by the legislative branch of the government, the judicial branch will act with great caution in declaring it unconstitutional, and will do so 'only,' as Chief Justice Black said in Sharpless v. Mayor, etc., of Philadelphia, 21 Pa. 164, 59 Am. Dec. 759, 'when it violates the Constitution clearly, palpably, plainly, and in such manner as to leave no doubt or hesitation on our minds.' For, as Chief Justice Marshall said in Fletcher v. Peck, 6 Cranch, 126, 3 L. Ed. 162: 'The question whether a law be void for its repugnancy to the Constitution is, at all times, a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative in a doubtful case. The court, when impelled by duty to render such a judgment, would be unworthy of its station, could it be unmindful of the solemn obligations which that station imposes. But it is not on slight implication and vague conjecture that the Legislature is to be pronounced to have transcended its powers, and its acts to be considered as void. The opposition between the Constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other.'"

This extract states my attitude toward the act now before this court. That act is an alleged exercise of power under the eighth section of article 1 of the federal Constitution, which conferred on Congress power "to regulate commerce * * * among the several states." Its subject-matter is "any article or commodity, other than timber and the manufactured products thereof, manufactured, mined, or produced" by an interstate railroad, or "which it may own in whole or in part, or in which it may have any interest, direct or indirect." That it affects such articles only when they have reached a commercial stage, viz., are "manufactured, mined, or produced," and become subjects of inter-

state commerce, viz., by carriage "from any state, territory, or the District of Columbia, to any other state, territory, or the District of Columbia, or to any foreign country," the act provides. And that such commodities are articles of commerce is clear. Gibbons v. Ogden, 9 Wheat. 1, 6 L. Ed. 23. These commodities, the act says, it shall be unlawful for any railroad to transport between the states when "manufactured, mined, or produced by it, or under its authority, or which it may own in whole, or in part, or in which it may have any interest, direct or indirect." It does not forbid a railroad to own or operate mines or manufactories. It does not preclude sale of its product or debar carriage thereof from the state. It simply puts the carrier owner on the basis of all other owners and shippers of commodities, viz., transportation of its and their product by a disinterested carrier. Its manifest purpose is to prevent, in shipments, favor to any, and secure fairness to all.

At this point we note that the prior action of any state authorizing such carrier to own manufactories or mines could in no way detract from the power of Congress to thereafter regulate interstate commerce. Manifestly, such purchases under state authority created no obligation or contract on the part of Congress that it never would, in pursuance of its power to regulate commerce between the states; enact laws which might restrict carriers from the interstate carriage of their own products. Mere inaction, mere omission to exercise a constitutional power, cannot estop that body; for such a doctrine of congressional estoppel would compel it to forestall the laws of every state and seriously impair the exercise of the power to regulate commerce. In effect it would place in each state a veto on the power to regulate conferred on the United States. The contention for congressional estoppel is best answered by Mr. Justice Harlan in Union Bridge Company v. United States, 204 U. S. 400, 27 Sup. Ct. 380, 51 L. Ed. 523, where he says:

"There are no circumstances connected with the original construction of the bridge, or with its maintenance since, which so tie the hands of the government that it cannot exert its full power to protect the freedom of navigation against obstructions. Although the bridge, when erected under the authority of a Pennsylvania charter, may have been a lawful structure, and although it may not have been an unreasonable obstruction to commerce and navigation as then carried on, it must be taken, under the cases cited, and upon principle, not only that the company when exerting the power conferred upon it by the state, did so with knowledge of the paramount authority of Congress to regulate commerce among the states, but that it erected the bridge subject to the possibility that Congress might, at some future time, when the public interest demanded, exert its power by appropriate legislation to protect navigation against unreasonable obstructions. Even if the bridge, in its original form, was an unreasonable obstruction to navigation, the mere failure of the United States, at the time, to intervene by its officers or by legislation and prevent its erection, could not create an obligation on the part of the government to make compensation to the company if at a subsequent time, and for public reasons, Congress should forbid the maintenance of bridges that had become unreasonable obstructions to navigation. It is for Congress to determine when it will exert its power to regulate interstate commerce. Its mere silence or inaction when individuals or corporations, under the authority of a state, place unreasonable obstructions in the waterways of the United States, cannot have the effect to cast upon the government an obligation not to exert its Constitutional power to regulate inter-

state commerce, except subject to the condition that compensation be made or secured to the individuals or corporation who may be incidentally affected by the exercise of such power. The principle for which the bridge company contends would seriously impair the exercise of the beneficent power of the government to secure the free and unobstructed navigation of the waterways of the United States. We cannot give our assent to that principle."

But in the present cases we have a different situation. The purpose of this federal statute of 1906, to divorce, in interstate commerce, the dual relation of carrier and producer, was anticipated by intrastate legislation 30-odd years before by the state of Pennsylvania. In its Constitution of 1874 (section 5, art. 17) that state provided that:

"No incorporated company, doing the business of a common carrier shall, directly or indirectly, prosecute or engage in mining or manufacturing articles for transportation over its works, nor shall such company, directly or indirectly, engage in any other business than that of a common carrier, or hold or acquire lands, freehold or leasehold, directly or indirectly, except such as shall be necessary for carrying on its business; but any mining or manufacturing company may carry the product of its mines and manufactories on its railroad or canal not exceeding fifty miles in length."

The effect of this constitutional provision upon the legality of the purchase of lands by carriers has never been passed upon by the Supreme Court of that state. Assuming it was not self-operative, in the sense that it required legislation to enable the state to forfeit title to lands acquired in the face of it, for this alone was decided in Commonwealth v. New York, Lake Erie & Western Railroad Company, 132 Pa. 591, 19 Atl. 291, 7 L. R. A. 634, yet certain it is it strips every purchase in Pennsylvania since 1874 of mining properties by common carriers of the status of innocent purchases, and the answers do not allege that the purchases of these respondents were all prior thereto and whether or not they had elected to accept the provisions of the Constitution. Now the object of this federal statute is clear. It seeks, in the sphere of interstate commerce, and, be it observed, in it alone, to enforce proper service by carriers of such commerce, by divorcing their public duty as common carriers from their private interest in carrying their own products. It forbids them to become competitors of their own customers. Such carriers are created and vested with public rights to enable them to serve as common carriers. "The question," say the Supreme Court in Cherokee Nation v. South Kansas Railroad Company, 135 U. S. 657, 10 Sup. Ct. 971, 34 L. Ed. 295, "is no longer an open one as to whether a railroad is a public highway, established primarily for the convenience of the people and to subserve public ends." So far as this dominant, public purpose is concerned, their lawful ownership of private property is an incident to enable them to fulfill, certainly not to thwart, this public duty. "Though the corporation in respect to its capital is private, yet it was created to accomplish objects in which the public have a direct interest and its authority to hold land was conferred that these objects might be worked out." Western Union Telegraph Company v. Pennsylvania Railroad Company (C. C.) 120 Fed. 367, quoting Railroad v. Colwell, 39 Pa. 339, 80 Am. Dec. 526.

Now, rightly or wrongly, Congress determined that the interstate carriage of the commodities produced from carriers' property injuri-

ously affected their public duty, and enacted that the full enjoyment of the secondary and private right of private carriage must yield to the primary and higher requirement of public duty. Of the wisdom of that body in adopting the particular course of the statute the courts cannot inquire. "The question is for us one of power only, and not of policy." United States v. Joint Traffic Association, 171 U. S. 505, 19 Sup. Ct. 25, 43 L. Ed. 259. For, as said of the interstate commerce act by Mr. Justice White in New Haven Railroad Company v. Interstate Commerce Commission, 200 U. S. 399, 26 Sup. Ct. 280, 50 L. Ed. 515:

"If the result of applying the prohibitions as we have interpreted them will be practically to render it difficult, if not impossible, for a carrier to deal in commodities, this affords no ground for relieving us of the plain duty of enforcing the provisions of the statute as they exist. This conclusion follows, since the power of Congress to subject every carrier engaging in interstate commerce to the regulations which it has adopted is undoubted."

That the regulation of interstate commerce was the object of this law is clear. When it was under consideration the mover of the amendment said it was intended—

"to divorce transportation from production on the part of the railroads engaged in transporting coal they mined and sold in competition with other shippers, which was a great abuse. This abuse grew into a grievous wrong to independent shippers. I sought to correct this abuse by an amendment confining railroads to their legitimate business of transporting freight and passengers, and prohibiting them from engaging in the transportation of any commodity which they might own, except for their own use."

Indeed, the dual and conflicting relation of public carrier and private producer was a matter of common observation. We have seen how it had been constitutionally forbidden in Pennsylvania in 1874. In the case of Attorney General of Great Britian v. Great Northern Railway Company, 29 Law Journal (N. S. Equity) 794, decided in 1860, the question was whether dealing in coal by a railroad was illegal, because incompatible with its duty as a public carrier and calculated to injure the public. It was there held that the act of Parliament granting the charter to operate the railroad implied a prohibition against the company engaging in any other business; the court saying:

"These large companies, joint-stock companies generally, for whatever purpose established, and more particularly railway companies, are armed with powers of raising and possessing large sums of money—large amounts of property—and if they were to apply that money, or that property, to purposes other than those for which they were constituted, they might very much injure the interests of the public in various ways. * * * Here we find this company, having the traffic from the north of England, where the great coal fields are (at least some of the principal coal fields), supplying the country with coal, or capable of supplying it. This company buys the coal, which gives to the company an interest in checking, as much as possible, those who will not deal with them; and it is quite clear that it is possible, by the mode in which this company may—I will not say has, but by the mode in which this company may—exercise such powers as either it has or assumes to have, this company may get into their hands the traffic; that is, the dealing in all the coal in the large districts supplying coal to the country. They have to a considerable extent done so, and there is no reason why it should not go on progressing. I observe that in the six years from 1852 to

1857, inclusive, the amount of their coal business has increased from 73,000 tons to 794,000 tons; and there is no reason, as the affidavits show, why they should not—there is great danger that they may—get into their hands the entire business in the coal of all that district of country. * * * There is, therefore, great detriment to the interests of the public, for this reason, taking merely the article of coal."

Accordingly an injunction was granted, and, no case to the contrary being cited, it would seem that its principles now are, and since 1860 have been, the law of England on the dual relation of common carriers.

Moreover, this dual relation of public carrier and private producer was involved in the case of New Haven Railroad Company v. United States, supra, and in discussing its effect on the requirement of the interstate commerce act that the carrier adhere to published rates Mr. Justice White said:

"The existence of such a power in its essence would enable a carrier, if it choose to do so, to select the favored persons from whom he would buy and the favored persons to whom he would sell, thus giving such persons an advantage over every other, and leading to a monopolization in the hands of such persons of all the products as to which the carrier chose to deal. Indeed, the inevitable result of the possession of such a right by a carrier would be to enable it, if it chose to exercise the power, to concentrate in its own hands the products which were held for shipment along its line, and to make it, therefore, the sole purchaser thereof and the sole seller at the place where the products were to be marketed; in other words, to create an absolute monopoly. To illustrate: If a carrier may, by becoming a dealer, buy property for transportation to a market and eliminate the cost of transportation to such market, a faculty possessed by no other owner of the commodity, it must result that the carrier would be in a position where no other person could ship the commodity on equal terms with the carrier in its capacity of dealer. No other person owning the commodity being thus able to ship on equal terms, it would result that the owners of such commodity would not be able to ship, but would be compelled to sell to the carrier."

In the light of these views, it must be presumed, for every presumption of the integrity of purpose of the lawmaking power must be made, that Congress, in passing this act, sought not to confiscate private property, but rather to avert by due regulation the evils the carrier had itself brought about by allowing private interest to injuriously affect public duty. And while, as we have said, the wisdom or otherwise of Congress in the measures it adopts is not a subject of judicial scrutiny, for "in determining the character of the regulations to be adopted Congress has a large discretion which is not to be controlled by the courts, simply because, in their opinion, such regulations may not be the best or most effective that could be employed" (Lottery Case, 188 U. S. 353, 23 Sup. Ct. 321, 47 L. Ed. 492), yet the recognition by courts of an evil to be remedied and the avowed purpose of Congress to stop such evil may throw some light on that which, after all said, is a question of fact, rather than law, namely, whether this act is a real regulation of commerce, or, under the guise of regulation, a prohibition of holding property. And as bearing on the conditions in view of Congress the facts set forth in the answer of one of the defendants are highly suggestive, viz.:

"This defendant, further answering, says that anthracite coal is an article of prime necessity and is universally used for domestic purposes throughout New England and the Middle Atlantic states, and to a great extent through-

out other sections of the country. The source of the entire supply, save a few small deposits of inferior quality, is located within the state of Pennsylvania, and the deposits extend over an area of only about 484 square miles, divided for trade purposes into three 'regions,' the Wyoming (sometimes called the Lackawanna) region, the Lehigh region, and the Schuylkill region. Ninety per cent., approximately, of the entire unmined area of anthracite coal is owned or controlled by the following named companies, or by 'subsidiary coal companies,' so called—that is, companies in which they have an entire or controlling stock interest—viz., the Reading Company, the Pennsylvania Railroad Company, the Delaware, Lackawanna & Western Railroad Company, the Lehigh Valley Railroad Company, the Central Railroad of New Jersey, the Delaware & Hudson Company, the Erie Railroad Company, and the New York, Ontario & Western Railroad Company, and from 70 to 75 per cent. of the annual supply of anthracite coal in the United States is, and for many years past has been, produced either directly by said companies, as in the case of the Delaware, Lackawanna & Western Railroad and Delaware & Hudson Companies, or through the agency of the said 'subsidiary' coal companies."

Such facts may have been ground in the mind of Congress to justify restricting transportation regulations, when it saw that these private acquisitions by public carriers, up to 90 per cent. of the entire anthracite supply, had resulted from the mere inaction of Congress to restrict carriers in their interstate relations to their public and primary service of transportation. The facts set forth in this answer disclose a greater and more significant absorption than that in the English case, of which the Supreme Court, in New Haven Railroad Company v. Interstate Commerce Commission, supra, said:

"Here it is unquestioned that the Chesapeake & Ohio, as a result of its being a dealer, had become long prior to the adoption of the interstate commerce law, and continued to be thereafter, up to the passage of the West Virginia statute prohibiting a carrier from dealing in coal, virtually the sole purchaser and seller of all the coal produced along the line of its road. That this result was not merely accidental, but was in effect engendered by the power of the carrier to deal and transport a commodity, is illustrated by the case of Attorney General v. Great Northern Railway Company, 29 Law Journal (N. S. Equity) 794."

But, apart from authoritative statements, it must be clear to thoughtful men that the conduct of a carrier is the most vital and essential requisite to fair enjoyment of the benefits of commerce. Such being the case, it is equally clear that to be effective the power to regulate commerce must include ability to regulate the carrier, for to exclude it strips the power to regulate of all remedial strength. Regulation of the carrier, then, being essential to the power to regulate commerce, and the regulation of commerce between all states being delegated by the Constitution to the United States, it follows that any control or regulation of a carrier by a state, which affects the performance of the carrier's interstate service, is unconstitutional. "In a large proportion of the cases in respect to interstate commerce brought to this court," say the Supreme Court in Re Debs, 158 U. S. 564, 15 Sup. Ct. 900, 39 L. Ed. 1092, "the question presented was of the validity of state legislation in its bearings on interstate commerce, and the uniform course of decision has been to declare that it is not within the competency of a state to legislate in such a manner as to obstruct interstate commerce."

It is clear, therefore, that if the act now before us, which makes it "unlawful for any railroad company to transport from any state * * * to any other state * * * any article or commodity * * * manufactured, mined, or produced by it," etc., had been passed, for example, by the state of Pennsylvania, it would be unconstitutional, because, by circumscribing the carrier's power and regulating its duty in the interstate carriage of commerce, that state exercised power to regulate commerce between states, which the Constitution committed to the United States. We are not, therefore, embarrassed, in this case, by any question of trenching on the right of a state. Such being the case, one of two results must follow—either the right to regulate the interstate carrier's efficient performance of duty rests in Congress and its regulation must prevail, or no power to regulate interstate carriers exists, and the carriers "are a law unto themselves." Unfortunate as this would be, yet the nonexistence of a power affords no ground for vesting such power in Congress. But there is neither warrant nor necessity for such fallacious reasoning. The federal power rests on the sound and sufficient warrant of the Constitution itself, which gave the United States the power to regulate commerce between all the states. There is no mistaking the Constitution's plain words. The power to regulate means sufficient power to effectually regulate, for, as said by Chief Justice Marshall, in McCulloch v. Maryland, 17 U. S. 411, 4 L. Ed. 579:

"The Constitution of the United States has not left the right of Congress to employ the necessary means for the execution of the powers conferred on the government to general reasoning. To its enumeration of powers is added that of making 'all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this Constitution in the government of the United States, or in any department thereof.'"

Now it would seem idle for practical men to discuss the question whether regulation of the carrier to insure performance of its duty is not vital to the regulation of commerce. In the very nature of things the right of the people of one state to market their products in another, and the corresponding right of the people of the latter to enjoy the products of the former, cannot be mutually enjoyed unless there be some regulating power over the carrier who performs the interstate service. Seeing, as said by Mr. Justice Peckham in United States v. Joint Traffic Association, supra, "the business of a railroad carrier is of a public nature, and in performing it the carrier is also performing to a certain extent a function of government, which requires them to perform the service upon equal terms to all," by whom shall the requirement be made, unless by Congress, and on whom, except upon the carrier? And, clearly, the general power to forbid a public carrier from doing what hinders its performance of a public duty could not, before the Constitution, be denied to a sovereign state, for "the states were, unquestionably, supreme," says Mr. Justice Johnston in Gibbons v. Ogden, supra, "and each possessed that power over commerce which is acknowledged to reside in every sovereign state." When, then, all the states and the people thereof granted to the United States the broad power to regulate commerce between the

164 F.—17

states, did the incident to such power, namely, control of the carriers of such commerce, cease to exist, or did it pass to the nation as an incident to the general power? If the sale of a vessel vests in the new owner the right to thereafter control engine and rudder, without mention of such power in the bill of sale, there can be no doubt that the grant of the general power to regulate commerce carried with it the right to regulate the carriers thereof as agencies of commerce.

It is no answer to this to say that sufficient power to regulate and control exists·in Congress in forbidding rebates and enforcing uniform rates. To concede to Congress power to regulate carriers by such means is to concede it power to regulate by other means. For whether regulation is best exercised by punishing past, or by removing incentives to future, unfairness, is a question that concerns the exercise, but not the existence, of the power. Power to regulate commerce was held in the safety appliance cases—Johnson v. Southern Pacific Company, 196 U. S. 1, 25 Sup. Ct. 158, 49 L. Ed. 363—to justify regulations for safety devices upon carriers' cars, and if the power to regulate cars is an incident to the general power to regulate commerce, the power to make the carriers themselves efficient agencies of commerce cannot be gainsaid. Regulation of interstate carriers in the manner provided by this act invokes no new principle and subjects them to no other condition than that impliedly assumed by every one who enters upon a public duty, viz., that so far as private right interferes therewith it must be foregone. The right to contract belongs to every citizen; but, when a citizen becomes a member of Congress, all right to contract with his government is, by Rev. St. § 3739 (U. S. Comp. St. 1901, p. 2508), denied him. The profession of law has been held a right of which one may not be deprived by legislation, but only by decree of court. Ex parte Garland, 71 U. S. 333, 18 L. Ed. 366. But, when a lawyer becomes a federal judge, the law by Rev. St. § 713 (U. S. Comp. St. 1901, p. 578), forbids him the right to use his property and practice his profession. Such prohibitions are not restrictions of liberty or deprivations of property. They are the law's aids to public service. They make the public servant have an eye single to the public duty, voluntarily assumed, and in forbidding legislators, judges, and public carriers alike to act in a dual capacity the law but throws around them the time-proved safeguard of faithful service that "no man can serve two masters."

It remains to notice the objection that timber was excepted from the interdicted commodities. Reflection will show that, so far as the evils sought by this law to be cured are concerned, timber differed greatly from coal. Apart from the grants of timber lands to pioneer transcontinental roads along their rights of way, our attention has been called to no public carrier dealing in and transporting timber. Nature has prevented this. Forests make streams, and water, from its nearness, and timber, from its capacity to float, make water transportation timber's natural outlet. It is impossible, therefore, for any land carrier to become such a private carrier of its own timber as to affect its duty as a public carrier, and a railroad so quickly exhausts

the forests tributary to it that it could not long remain a distinctive timber road.

Satisfied, then, of the three propositions, namely, first, that under the Constitution the power to regulate commerce between the states is vested in Congress; secondly, that such power includes the power to regulate carriers thereof; and, thirdly, that the divorce of the dual relation of public carrier and private transporter is a regulation of commerce—I hold this law is constitutional, and from the opinion of the majority to the contrary I record my dissent.